J. PAUL CHAPMAN *v.* THE HUNTINGTON, WEST VIRGINIA, HOUSING AUTHORITY, *et al.*

(CC 610)

Submitted May 3, 1939. Decided June 13, 1939.

320

*Okey P. Keadle,* for plaintiff.
*Douglas C. Tomkies* and *Geo. I. Neal,* for defendants.

RILEY, JUDGE:

The plaintiff, J. Paul Chapman, a citizen, resident and taxpayer of the defendant, City of Huntington, seeks an injunction enjoining the defendant, The Huntington, West Virginia, Housing Authority, a corporation, and its commissioners from proceeding further with certain real estate developments in the City of Huntington; from acquiring land for that purpose and entering into any contract or contracts for said development and from obtaining from the United States Housing Authority any loans or contributions for said purpose; enjoining the defendant, the City of Huntington, and its officers from performing the agreements contained in two certain contracts entered into between the city and the defendant authority; and enjoining the defendant Martin, assessor of Cabell County, from removing the property of The Huntington, West Virginia, Housing Authority from the tax books of his county. A demurrer to the amended bill of complaint having been sustained, the sufficiency of the pleading has been certified to this Court for decision.

The amended bill of complaint alleges:

1. That plaintiff is a citizen, resident and taxpayer of the City of Huntington, owning taxable improved real estate similar in size to the units to be constructed by the defendant authority and renting for approximately the

same rents to be charged by the authority for its units.

2. That the defendant, The Huntington, West Virginia, Housing Authority, is a statutory corporation, created under the provisions of Chapter 93 of the Acts of the West Virginia Legislature, 2d Ex. Sess., 1933 (West Virginia Housing Act) with commissioners constituting said authority as named in the bill of complaint; that the defendant, the City of Huntington, is a municipal corporation with mayor and councilmen as named in said bill, and that defendant Martin is the assessor of Cabell County.

3. That the mayor of the City of Huntington appointed the defendant commissioners of the defendant authority pursuant to a direction of the council of said city in a resolution passed January 24, 1938, and exhibited to the bill, which reads in part as follows:

"Therefore Be It Resolved, that the Council of said city do hereby find and determine that substandard conditions do exist in this city, that it is necessary in the public interest that they be corrected, and that there is need in the City of Huntington for the creation of a public housing authority to engage in a low-cost housing and slum clearance program."

4. That the commissioners organized the defendant authority and with utmost secrecy, and, without notice or opportunity to any interested citizens or taxpayers to be heard, set about to create housing authority developments of which the details were not disclosed until December 12, 1938.

5. That complainant is not advised as to what investigation was made by the defendant authority of the need for additional housing facilities in the City of Huntington, and no hearing was had, and though an interested group of citizens requested an opportunity to make representations regarding such need, the request was refused.

6. That defendant authority entered into negotiations with the United States Housing Authority for the loan of funds or a subsidy of public funds for the support of its proposed development, and annual contributions by the

city by tax exemptions or otherwise equal to twenty per centum of the annual contributions by the United States Housing Authority, pursuant to the provisions of the United States Housing Act of 1937. (September 1, 1937, c. 896, 50 U. S. Stat. 888.)

7. That to comply with the provisions of the United States Housing Act, two contracts, by authority of two ordinances passed by the city council on July 11, 1938, were entered into between the authority and the city as follows:

> (a) The first contract (hereinafter spoken of as city's contributions contract) binds and obligates the city for the term of not less than sixty years, (1) not to levy, impose, or charge against the authority or its property, any taxes, special assessments, service fees, charges, or tolls, (2) to furnish to and for the project, and all tenants thereof, all municipal services and facilities furnished by it to the other inhabitants and taxpayers of the city, (3) to maintain in good repair and working order any and all municipal utilities and facilities provided by it for the use of the project and the tenants thereof, and (4) to maintain in good repair streets, roads and alleys adjoining to or within the boundaries of the projects and used by the public; and the contract then provides that it might be assigned, along with the city's obligations therein contained, as security for any bonds issued by the defendant Authority to raise funds with which to construct the proposed project.

> (b) The second contract (hereinafter spoken of as city's slum-clearance contract) binds and obligates the city to eliminate within twelve months after the completion of the development, one dwelling unit for each unit constructed by the defendant Authority.

The preamble to the ordinance providing for slum clearance recites that there exists in the city a large number of unsafe and insanitary dwelling units.

8. That after the execution of the contributions and the slum-clearance contracts, the defendant authority

negotiated two contracts with the United States Housing Authority. The first contract provides that the United States Housing Authority will make annual contributions over a period of sixty years of a specified amount based initially upon not more than three and one-half per centum annually of the estimated development cost, plus the margin of safety of one-ninth of the projects with the right of said authority to examine and re-examine the projects and withdraw its aid and contribution in the event of breach of contract.

The second contract, or loan contract, provides that the United States Housing Authority will loan to the defendant authority an amount equal to ninety per centum of the construction cost, being $2,311,200.00, the local authority to raise the remainder by bonds issued on the projects, which contract recites that the city had entered into binding agreements for equivalent elimination of existing units and twenty per centum contributions toward the maintenance of the projects.

9. That defendant authority, on December 12, 1938, advised the mayor and council by an undated letter of its proposal to construct five hundred dwelling units in the city at a cost of $2,568,000.00, in three separate projects as follows: (a) At Eighth Avenue, Seventeenth Street and Artisan Avenue, eighty units for occupancy by colored people; (b) On Doulton Avenue, Sixteenth Street and Charleston Avenue, one hundred, thirty-six units, for white people; and (c) On the north side of Olive Street, between St. Louis Avenue and Smith Street, two hundred, eighty-four units for white people.

10. That based on the development cost of $2,568,000.00, set forth in said letter, the federal annual contribution will be $89,880.00, and the city's twenty per centum, or $17,976.00, making a total of $107,856.00, or $215.71 per each unit.

11. That the following requirements were imposed by the defendant authority upon the occupancy of the proposed units under the requirements of the United States Housing Authority, namely: (a) Only such persons as are

approved by the defendant Authority, or its agents, will be admitted as tenants; (b) Only persons regularly and gainfully employed will be admitted; (c) Persons earning less than $720.00 per annum, or more than $1,440.00 per annum, will not be admitted as tenants; (d) Rentals to be charged by the defendant Authority will be not less than $4.00 per room per month, plus not less than $1.50 per month per room for utilities furnished, making rentals $19.25 per month to $33.00 per month, depending on the size of the unit.

12. That the City of Huntington, with a population of 75,572, is built over a large area in the Ohio Valley where there is available ample building room, so that dwellings, including those of moderate and low cost have been built · on large size lots, and for that and other reasons "slum areas to the extent that have come to exist in other cities of equal or larger size," have not come to exist in the City of Huntington; that there are approximately twenty thousand dwelling units in the City of Huntington, including an ample supply of houses available to persons of the income class to which the units of defendant authority are restricted, equivalent to and producing rents equal to or less than those of the defendant authority's proposed units.

13. That the projects proposed to be constructed are not slum-clearance projects and are not intended as such for the following reasons: (a) That the entire amount of money available to the defendant Authority will be used for new construction, and no part thereof will be used for slum-clearance; (b) That the site on Eighth Avenue where the eighty units for colored people will be built is not a slum area; (c) That the site on Doulton Avenue where the one hundred, thirty-six units for white people will be built consists largely of an old factory site, and is not a slum area; (d) That the site on Olive Street where the two hundred eighty-four units for white people will be built is in one of the best sections of the city devoted to moderate-priced homes, and is not a slum area; (e) That such houses as are on the first two of the said sites as have been acquired by the defendant Authority along with

the ground, have not been demolished or eliminated, but have been sold by the Authority and removed to other places in the city; (f) That persons occupying the so-called slum areas of the city, who are persons with no regular employment, on relief and W. P. A. rolls, and who do not earn as much as $60.00 per month, and are therefore not qualified to occupy the new units, and will not be accepted as tenants by the defendant Authority; (g) That the city will not clear any slums because it has no funds available for the purpose, and no means of housing the present occupants thereof, who, as stated, will not be accepted as tenants by the defendant Authority.

14. That the current annual budget shows that it has no funds to carry out the obligations assumed by it in the contracts with the defendant authority.

15. That Chapter 93 of the Acts of the Legislature in question is unconstitutional and void in that it undertakes to exempt from taxation all the property of defendant authority.

16. That the findings of the city council recited in its resolution and ordinances were made without investigation of the housing needs of the city.

17. That because the proposed projects will care for only about two thousand people out of the total population of the City of Huntington, the projects, favoring as they do, a small group, constitute a gross discrimination against home owners and renters in the city.

18. That the projects will have no effect whatever upon the slum areas, such as they are, nor upon the inhabitants thereof; that such areas will not be cleared nor the inhabitants furnished with any housing accommodations other than those which they now occupy; for which reasons and others stated in the bill the project will have no relation to the elimination of conditions which are a menace to public health, safety, morals or welfare.

19. By way of summary in paragraph 19 of the bill of complaint, plaintiff says that the projects and contracts under consideration are illegal, void and unenforceable for the following reasons: (1) The projects are not authorized by the West Virginia Housing Act because they

are not slum-clearance projects; (2) city has no power to contribute any funds towards projects because the city's contributions and slum-clearance contracts are void; (3) the West Virginia Act requires an investigation by defendant authority and none was made; (4) the West Virginia Act, if it permits the authority to engage in housing apart from slum-clearance violates West Virginia Constitution, Art. III, Sections 9 and 10, and the Fourteenth Amendment to the Constitution of the United States; (5) the city's contracts with the housing authority are void because in violation of section 26, of chapter 67, Acts 2d Ex. Sess., 1933 (superseding article 8, chapter 11, Code, 1931), prohibiting expenditure of funds not available to city; (6) said contracts violate West Virginia Constitution, Art. X, Section 8, because not authorized by vote of people; (7) said contracts deprive plaintiff of property without compensation and due process in violation of Constitution, Art. III, Sections 9 and 10, and without due process and equal protection of the law in violation of the Fourteenth Amendment to the Constitution of United States; (8) section 14 of the West Virginia Act providing for tax exemption of the proposed projects violates West Virginia Constitution, Art. X, Sections 1 and 9, requiring uniformity of taxation; (9) the delegation of powers to defendant authority is unconstitutional under West Virginia Constitution, Art. VI, Section 1, because not prescribed by proper standard as to (a) number of dwelling units, (b) costs thereof, (c) rentals, (d) selection of tenants, and (e) terms, prices or advertisements of sale; (10) loans from United States Housing Authority to defendant authority unauthorized because projects are not slum-clearance; and (11) United States Housing Act is void if it authorizes housing apart from slum clearance.

For convenience, plaintiff's position will be followed as set forth in his briefs, rather than in the order suggested by the bill of complaint.

As a primary proposition, plaintiff asserts that the West Virginia Housing Act (Chapter 93, Acts West Virginia Legislature, 2d Ex. Sess., 1933) is unconstitutional and

void in that it deprives him of property without compensation and without due process of law in violation of the West Virginia Constitution, Art. III, Sections 9 and 10, and the Fourteenth Amendment to the Constitution of the United States. In support of this proposition, a number of cases are cited, none of which, however, involve an appraisal of any of the concomitant housing acts enacted by the several states. An examination of the cases dealing with the constitutionality of the state housing acts, however, discloses that the legislation has been uniformly upheld in a series of recent decisions. *In re Opinion of the Justices*, 235 Ala. 485, 179 So. 535; *Marvin* v. *Housing Authority of Jacksonville, et al.*, 133 Fla. 590, 183 So. 145; *Williamson* v. *Housing Authority of Augusta, et al.*, 186 Ga. 673, 199 S. E. 43; *Krause, et al.*, v. *Peoria Housing Authority, et al.*, 370 Ill. 356, 19 N. E. (2d) 193; *Edwards, et al.* v. *Housing Authority of Muncie, et al.*, Ind. Sup., 19 N. E. (2d) 741; *Spahn, et al* v. *Stewart, et al.*, 268 Ky. 97, 103 S. W. (2d) 651; *State ex rel. Porterie, Atty. Gen.* v. *Housing Authority of New Orleans, et al.*, 190 La. 710, 182 So. 725; *Rutherford, et al.* v. *City of Great Falls, et al.*, 107 Mont. 512, 86 Pac. (2d) 656; *New York Housing Authority* v. *Muller, et al.*, 270 N. Y. 333, 1 N. E. (2d) 153, 105 A. L. R. 905; *Wells* v. *Housing Authority of Wilmington, et al.*, 213 N. C. 744, 197 S. E. 693; *Dornan* v. *Philadelphia Housing Authority*, 331 Pa. 209, 200 Atl. 834; *McNulty* v. *Owens, Mayor, et al.*, 188 S. C. 377, 199 S. E. 425.

The instant statute, we note, dovetails into the United States Housing Act. This statement will be discussed later under the second point of plaintiff's brief. In the first place, its provisions prescribe a twofold purpose: (1) slum clearance; (2) low-cost-housing development. Its title describes it as being in part "An Act * * * to declare the necessity of creation of bodies corporate and politic, to be known as housing authorities to engage in slum clearance and low-cost housing projects * * *." Section 1(h) describes "slum clearance" as including "the removal of housing conditions which shall be considered by the housing authority of the city in which such conditions exist

to be unsanitary or substandard or a menace to public health, and shall also include such other activities as may, at any time, be embraced within said term as used in the national recovery act." And section 2 vests the local housing authorities with "all powers necessary or appropriate in order that they may engage in low-cost housing and slum clearance projects * * * including the power to acquire property, to remove unsanitary or substandard conditions * * *." Sections 2 and 19 expressly provide that the enactment is necessary to promote and protect health, morals, safety and public welfare. Because it is tied in with the United States Housing Statute, the provisions of the latter statute are pertinent in determining the underlying purposes of our act. The purposes of the United States Act embraced in section 1 thereof are as follows:

> "It is hereby declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this Act, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation."

Section 2 defines "slum" and "slum clearance" as follows:

> "The term 'slum' means any area where dwellings predominate which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitation facilities, or any combination of these factors, are detrimental to safety, health, or morals.

> "The term 'slum clearance' means the demolition and removal of buildings from any slum area."

It seems to us from a reading of both acts that the primary purpose of Chapter 93 is slum clearance, and auxiliary thereto, low-cost-housing development.

In these modern times, it can scarcely be gainsaid that slums are areas having insanitary and substandard housing, and are a menace to the health, welfare and morals of any community in which they exist. Slum areas, because of the congestion, filth and insanitary conditions which are their ever-existing qualities are the breeding places of crime, immorality and disease. These evils necessarily and inevitably strike at the heart of the happiness and well being of all the people of the community. They cannot run rampant in any part of a community without stretching their tentacles menacingly throughout its entire length and breadth. Thus the eradication of slum areas would seem to rest upon the firm foundation of the police power which inherently resides in the legislative branch of every state government. Any purpose leading toward that end is a public purpose. *McNulty* v. *Owens, supra; Spahn* v. *Stewart, supra; Willmon* v. *Powell, et al.,* 91 Cal. App. 1, 266 Pac. 1029; *Dornan* v. *Philadelphia Housing Authority, supra; Knoxville Housing Authority, Inc.,* v. *City of Knoxville, et al.* 174 Tenn. 76, 123 S. W. (2d) 1085. In the latter case, the Supreme Court of Tennessee said, as we say here, that the novelty of the purpose does not render it the less a public purpose. Of course, the conception of a public purpose must expand within constitutional limits with the broadening of the functions of government and the growth of the country. A public purpose, as defined by the Supreme Court of North Dakota in *Green* v. *Frazier,* 44 N. D. 395, 176 N. W. 11 (affirmed by the Supreme Court of the United States in 253 U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878), and quoted with approval in the *Spahn* case "has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within a given political division * * * the sovereign powers of which are exercised to promote such public purpose."

The further question arises here, whether the amended bill of complaint sufficiently alleges the projects involve slum clearance. No satisfactory appraisal of the bill can

be made without considering the recitals contained in (1) the Act of Congress creating the United States Housing Authority (September 1, 1937, c. 896, sec. 1, 50 U. S. Stat. 888); (2) the West Virginia Housing Act (Chapter 93, Acts West Virginia Legislature, 2d Ex. Sess., 1933); (3) the resolution adopted by the council of the defendant city on January 24, 1938; and (4) the ordinance, providing for slum clearance, adopted by said council on July 11, 1938.

The declaration of policy in the Act of Congress has been quoted heretofore. In section 2, West Virginia statute, appears the declaration of a legislative determination that "in order to promote and protect the health, safety, morals and welfare of the public, it is necessary in the public interest to provide for the creation of public corporate bodies to be known as housing authorities, and to confer upon and vest in said housing authorities all powers necessary or appropriate in order that they may engage in low-cost housing and slum clearance projects * * *." By resolution, dated January 24, 1938, the council of the City of Huntington found that substandard conditions exist in the city; that it is necessary in the public interest that they be corrected; and that there is need in the City of Huntington for the creation of a public housing authority to engage in a low-cost-housing and slum-clearance program. The ordinance adopted July 11, 1938, recites: "Whereas, there exists in the City a large number of unsafe and insanitary dwelling units; and it is necessary and desirable that the City should eliminate such unsafe and insanitary dwelling units to protect the health, safety and morals of the inhabitants of this City * * *." Thus, from the recitals contained in said legislative enactments, it appears that the purpose of the proposed projects involves slum-clearance and low-cost-housing development, and that there exists in the City of Huntington a large number of unsafe and insanitary dwelling units, endangering the health, safety and morals of the inhabitants of said city. The declaration of the city council, contained in the resolution and ordinance, as to the conditions actually existing in the city, is entitled to

great respect. In fact, it is not subject to attack unless clearly wrong. 11 Am. Jur. 823, notes 20, 1. Whenever there is reasonable ground for difference of opinion as to the determination of facts by a legislative body, its findings are not subject to judicial review. *Norman* v. *Baltimore & O. R. Co.*, 294 U. S. 240, 79 L. Ed. 885, 55 S. Ct. 407, 95 A. L. R. 1352; *Radice* v. *New York*, 264 U. S. 292, 68 L. Ed. 690, 44 S. Ct. 325. It follows that the allegations of a bill of complaint denying the existence of slum areas in the City of Huntington must be clear and explicit. The Act of Congress describes the term "slum" as "any area where dwellings predominate which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitation facilities, or any combination of these factors, are detrimental to safety, health or morals." The West Virginia statute defines "slum clearance" as including "the removal of housing conditions which shall be considered by the housing authority of the city * * * to be unsanitary or substandard or a menace to public health * * *." This being the basic law upon which the projects were founded, the use of the words "slum" and "slum clearance" in the amended bill must measure up to the definition contained in the Act of Congress and the West Virginia statute. In paragraph 12 of the amended bill, plaintiff alleges that "slum areas to the extent that have come to exist in other cities of equal or larger size", have not grown up in the defendant city. Surely that is not the test. It can hardly be said that a comparison of the slum areas of the City of Huntington with those in other cities constitutes a denial of the existence of slums as defined by the United States and West Virginia Acts. Moreover, the general statement contained in paragraph 19 of the amended bill to the effect that the projects do not involve slum clearance is grounded upon reasons which do not sustain it, and is merely a statement of a conclusion. Thus the allegations to the effect that the site on Eighth Avenue, where 80 units for colored people will be built, the site on Doulton Avenue, where 136 units for white people will be built, and the site on Olive Street, where 284

units for white people will be built, are not slum areas, are dogmatic conclusions, state no valid reason therefor, and ignore the underlying purpose of the legislation. These grounds necessarily and incorrectly presuppose that the projects shall be built where slums have been cleared. No such supposition is contemplated by either act. The projects may be built in any area within the exercise of sound discretion of the federal and state authorities and the council of the City of Huntington, whether slum or not slum. They are simply low-cost-housing projects, incidental to slum clearance. In some cities it is quite conceivable that slums exist in low-water areas. Equally, it is quite inconceivable that public moneys in large amounts should be expended to build modern dwelling units where they will be subject to and endangered by rising waters. Thus the allegations of the amended bill of complaint, directed to the denial of slum clearance, are based upon unsound reasons.

But it may be said that this case being heard on the amended bill and the demurrer thereto, the various allegations of the bill must have been accepted as true, and, in any event, the defendants should have been put on answer. It is, of course, true that a demurrer admits as true every allegation of the bill properly pleaded, but the rule does not apply to a case where the allegations affect a matter as to which the courts are powerless to act, or where the allegations, when admitted, fail to justify the relief sought thereon. For example, the allegation to the effect that Huntington does not contain such slum areas as other cities of the same or larger size may be admitted without in the slightest degree undermining the finding of the city council that there are substandard conditions in the city and that need for the creation of a low-cost-housing and slum-clearance program exists. And the denial that the program involves slum clearance because the proposed housing projects are to be constructed on ground outside slum areas falls under the weight of its own error. Here, the legislature delegated to the council of the City of Huntington the power to determine the existence or non-existence of substandard conditions. The council

acted under that grant of power, presumably on information which enabled it to act intelligently. Having done so, we would not be warranted in substituting our judgment for that of the council, especially on the allegations of a bill which can in no sense be said to contain a direct charge that there are no slum conditions in the City of Huntington. We do not mean to say that the finding of the council is absolutely final, but to set it aside, there must be clear allegations of error. We see nothing in the amended bill which clearly raises any issue of fact. As to the allegations denying that the projects involve slum clearance, it seems to us that their form, considered along with the effect which should be given to the findings of the council, justify us in holding that they do not meet the test of the rule which would require an answer thereto. These allegations, if true, would not warrant the injunction sought.

Plaintiff further contends that the West Virginia Housing Act constitutes an improper and illegal delegation of legislative power. Art. VI, Section 1 of the Constitution of West Virginia, cited in plaintiff's brief, reads: "The legislative power shall be vested in a Senate and House of Delegates." Art. V, Section 1 of the Constitution provides that the legislative, executive and judicial departments of the state government shall be separate and distinct, "so that neither shall exercise the powers properly belonging to either of the others * * *." Under the last-mentioned constitutional provision, this Court has upheld the separation of governmental powers provided therein. Illustrative: *Sutherland v. Miller, Judge,* 79 W. Va. 796, 91 S. E. 993, L. R. A. 1917D, 1040; *Wheeling Bridge, etc., R. Co. v. Paull,* 39 W. Va. 142, 19 S. E. 551; *Hodges v. Public Service Commission,* 110 W. Va. 649, 159 S. E. 834; *State ex rel. Baker v. County Court of Tyler County, et al.,* 112 W. Va. 406, 164 S. E. 515. In *Hodges v. Public Service Commission, supra,* the Court held that the legislature cannot commit to the judiciary powers which are primarily legislative. The *Hodges* decision has been ably discussed in two recent articles: Kenneth C. Davis, "Judicial Review of Administrative Action in West Virginia," 44 W. Va. L. Q. 270, and Robert T. Donley, "The Hodges

Case and Beyond," 45 Id., 292. The separation-of-power rule, as expressed in the West Virginia Constitution, however, is not adamant. From time to time, courts have construed it as each case arises. They, Judge Hatcher suggests in the *Hodges* case, "have not drawn 'abstract, analytical lines of separation' (37 Harv. L. Rev., 1014) between the departments and that there is some overlapping of judicial and administrative duties." The same is true of the legislative delegation of powers to administrative bodies. Necessarily, in order to make government workable and economical, it must lend itself to practical considerations. Thus we find in practice the three departments of our government, both state and federal, are mutually dependent upon, and support, each other. *Wheeling Bridge, etc., R. Co.* v. *Paull, supra,* 144 of 39 W. Va. In *State ex rel. Hall* v. *County Court of Monongalia County,* 82 W. Va. 564, 572, 96 S. E. 966, 969, Judge Lynch said: "No one department can fully and completely fulfill or discharge the duties allotted to it without at least in part exercising some function belonging to one or both of the others."

The discretionary powers delegated to the local housing authority by the instant statute are indeed broad; but delegation of broad powers to an administrative body, accompanied by fitting standards for their exercise, does not of itself constitute an illegal transfer of legislative powers to the executive department of the government. Time and again, the legislature of this state has given broad powers to administrative bodies. Consider, for instance, the power of the State Auditor to apportion the value of public utilities among the counties, and districts and municipalities of each county (Code, 11-6-13), and the board quasi-judicial power resident in the Workmen's Compensation Appeal Board and the Public Service Commission (Code, 23-5-2, 3; Code, Chapter 24). Of course, delegation of discretionary power to an administrative body must be accompanied by adequate standards, either prescribed by the statute itself or inherent in the subject-matter of the legislation, sufficient to guide its exercise. Otherwise, it will be violative of Art. V of the West Vir-

ginia Constitution. Courts have upheld the necessity of governing standards to govern the exercise of discretionary power. Typical: *Panama Refining Company, et al. v. Ryan, et al.,* and *Amazon Petroleum Corporation* v. *Ryan, et al.,* 293 U. S. 388, 79 L. Ed. 446, 55 S. Ct. 241; *Schechter Poultry Corporation, et al.* v. *United States,* 295 U. S. 495, 79 L. Ed. 1570, 55 S. Ct. 837, 97 A. L. R. 947; *Krause* v. *Peoria Housing Authority, supra.* In the *Schechter* case, the Supreme Court of the United States held unconstitutional the provisions of Title I, Section 3 of the National Industrial Recovery Act of June 16, 1933, authorizing the making of codes regulating trades and industries by and with the approval of the President without setting up any standards aside from the general statement of the policy of the legislation contained in the statute. The Supreme Court of Illinois, in the *Krause* case held that the amendment to the Illinois Housing Act cured the original act which was unconstitutional because it did not set up any standard to govern the local authorities. Where, however, the administrative body already is governed by an adequate code, as in the case of the Interstate Commerce Commission, the delegation is constitutional. *Interstate Commerce Commission* v. *Louisville & N. R. Co.,* 227 U. S. 88, 57 L. Ed. 431, 33 S. Ct. 185; *Florida* v. *United States,* 282 U. S. 194, 75 L. Ed. 291, 51 S. Ct. 119; *United States* v. *B. & O. R. Co.,* 293 U. S. 454, 79 L. Ed. 587, 55 S. Ct. 268. The same is true of the West Virginia Public Service Commission. (Code, Chapter 24); *State* v. *Baltimore, etc. R. Co.,* 76 W. Va. 399, 85 S. E. 714; *Manufacturers' Light, etc. Co.* v. *Ott* (W. Va. D. C.), 215 F. 940. In general, see also, *United Fuel Gas Co.* v. *Public Service Commission,* 73 W. Va. 571, 80 S. E. 931, 9 A. L. R. 1426n. And where the subject to be administered involves services to be rendered and advantages to be derived therefrom which are inherently well defined, as in the case of the Federal Radio Commission, the delegation of broad discretionary powers is not unconstitutional. *Federal Radio Commission* v. *Nelson Bros. Bond., etc., Co.,* 289 U. S. 266, 77 L. Ed. 1166, 53 S. Ct. 627, 89 A. L. R. 406.

Where the delegation by the legislature of powers to an administrative body embraces full and comprehensive standards to govern the exercise thereof, with details only left to the administrative body, the powers delegated are administrative. Conversely, as the standards prescribed are diminished and restricted, the powers delegated become more clearly legislative. Between the extremes of adequate standards and no standards, there is a twilight zone in which each case must be appraised with a mind that the constitutional separation of powers in no case must be haphazardly set aside.

The statute under consideration evidently was unartfully drawn. In fact, of itself, it suggests no definite standard, and, taken alone, presumes to grant to the local housing authorities broad and unbridled discretionary powers. In truth and fact, its provisions do not approach the specific regulatory provisions of the state housing acts passed upon in the cases hereinbefore cited. Section 18 of the act provides, however: "The provisions of this act are severable, and if any shall be held unconstitutional the decision of the court shall not affect or impair any of the remaining provisions hereof. It is hereby declared as a legislative intent that this act would have been adopted had such unconstitutional provisions not been included herein." And section 1(h) provides the delegation to the local authorities of the power to engage in "such other activities as may, at any time, be embraced within said term [slum clearance] as used in the national recovery act." "National Recovery Act" is defined in section 1(g) of the West Virginia statute as "the act of Congress of the United States of America approved June sixteenth, one thousand nine hundred thirty-three, entitled 'An act to encourage national industry, to foster fair competition, and to provide for construction of certain useful public works, and for other purposes', and any acts amendatory thereof or supplemental thereto." This Act of Congress, though called "National Recovery Act" in the West Virginia statute, is also officially named the National Industrial Recovery Act. (June 16, 1933, c. 90, 48 U. S. Stat. 200.) Title II thereof authorizes the Presi-

dent of the United States to create a Federal Emergency Administration of Public Works, all powers of which shall be exercised by an administrator who, under the direction of the President, was directed to prepare a program of public works, including the "construction, reconstruction, alteration, or repair under public regulation or control of low-cost housing and slum-clearance projects." By an executive order of the President, No. 7732, dated October 27, 1937, all housing or slum-clearance projects constructed or in the process of construction on the date of the enactment of the United States Housing Act, all funds, property and employees of the Federal Emergency Administration of Public Works were transferred to the United States Housing Authority, an agency created by the United States Housing Act, in pursuance of section 4 of the said act, which reads in part as follows:

> "The President may at any time in his discretion transfer to the Authority any right, interest, or title held by any department or agency of the Federal Government in any housing or slum-clearance projects (constructed or in process of construction on the date of enactment of this Act Sept. 1, 1937), any assets, contracts, records, libraries, research materials, and other property held in connection with any such housing or slum-clearance projects or activities, any unexpended balance of funds allocated to such department or agency for the development, administration, or assistance of any housing or slum-clearance projects or activities, and any employees who have been engaged in work connected with housing or slum clearance. The Authority may continue any or all activities undertaken in connection with projects so transferred, subject to the provisions of this Act."

Under these circumstances, we are of opinion that the United States Housing Act is supplementary to the National Industrial Recovery Act, within the meaning of the West Virginia Housing Act and should be considered in the construction of the last-mentioned act.

Because the two contracts between the City of Huntington and the Huntington Housing Authority, involved in this case, namely, (1) the city's contributions contract, and (2) slum-clearance contract, conform in rather minute detail with the provisions of the United States Housing Act, which, in turn, supplements the National Industrial Recovery Act, the provisions of the former should be reviewed to determine whether or not it provides a standard for the guidance of the discretionary power of the local housing authority such as would render constitutional the West Virginia Housing Act. The United States Housing Act provides that the United States Housing Authority "may make loans to public-housing agencies to assist the development, acquisition, or administration of low-rent-housing or slum-clearance projects by such agencies * * *." (Section 9). Section 10 thereof provides that the authority may make annual contributions in assistance of low rentals, and also provides the following standard which shall govern the local authorities in the construction of housing and slum-clearance projects:

"Provided, That no annual contributions shall be made, and the Authority shall enter into no contract guaranteeing any annual contribution in connection with the development of any low-rent-housing or slum-clearance project involving the construction of new dwellings, unless the project includes the elimination by demolition, condemnation, and effective closing, or the compulsory repair or improvement of unsafe or insanitary dwellings situated in the locality or metropolitan area, substantially equal in number to the number of newly constructed dwellings provided by the project; except that such elimination may, in the discretion of the Authority, be deferred in any locality or metropolitan area where the shortage of decent, safe, or sanitary housing available to families of low income is so acute as to force dangerous overcrowding of such families."

Section 10 thereof further provides that "the fixed contribution payable annually under any contract shall in no case exceed a sum equal to the annual yield, at the

going Federal rate of interest at the time such contract is made plus 1 per centum, upon the development or acquisition cost of the low-rent-housing or slum-clearance project involved," and "all such annual contributions shall be used first to apply toward any payment of interest or principal on any loan due to the Authority from the public housing agency."

The United States Housing Act also contains satisfactory definitions of "low-rent housing", "families of low income", "slum" and "slum clearance." (Section 2). It requires the authority in January of each year to make a report to Congress of its operations and expenses, including loans, contributions, grants made or contracted for, low-rent-housing and slum-clearance projects undertaken and the assets and liabilities of the authority. Such report shall include operating statements of all projects under the jurisdiction of or receiving the assistance of the authority, including summaries of the income of occupants, sizes of families, rental and other related information. (Section 7). It limits loans on any one project to ninety per centum. (Section 9.) It contains various provisions as to capital grants in assistance of low-cost housing and limits same to the erection of low-cost-housing units not to exceed an equal number of unsafe or insanitary dwellings. (Section 11). It defines the powers of the authority as to foreclosure, payment of annual sums in lieu of local taxes, insurance on property, sale of property and securities. (Section 13). It further provides that no loan, annual contribution or capital grant shall be made in cities of less than five hundred thousand with respect to any project costing more than $4,000.00 per family dwelling unit or more than $1,000.00 per room, excluding land, demolition and low dwelling facilities. (Section 15).

Section 12 of the West Virginia act provides that the local authority shall keep its books and records in such form as shall be prescribed by or be satisfactory to the mayor of the city, which books shall show the income from and all sums chargeable against each project. Be-

fore January 31st of each year and from time to time, the authority shall make such reports as the mayor or council of the city may require.

A careful review of both housing statutes reveals that the local housing authorities have prescribed for them standards to govern the exercise of their discretionary powers, sufficient to sustain the delegation to them of said powers.

As a third proposition, plaintiff urges that the proposed development is unauthorized by the West Virginia statute because (a) the statute does not authorize housing projects apart from slum clearance, and (b) the proposed development is not based upon proper investigation with opportunity to interested citizens to be heard. True, the act does not authorize housing projects apart from slum clearance. If it did, there would indeed be grave doubt as to its constitutionality. The amended bill in the instant case, however, does not disclose that the housing projects are made without regard to slum clearance. Its allegations to that effect, as we have seen, are based upon the unsound proposition that the housing projects must be built on the same ground where the slum clearance is made. Nothing in the United States Housing Act or the West Virginia statute would indicate this requirement. Such requirement, if indicated, would hardly be reasonable, because, as suggested before, slums may be located in sections of a city where it would not be feasible or proper to erect new projects.

We see nothing in plaintiff's suggestion that the proposed development is not based upon proper investigation. The council of the City of Huntington, by resolution of January 24, 1938, and the ordinance of July 11, 1938, providing for slum clearance, found and determined that substandard conditions exist in defendant city. We must assume that these recitals contained in the formal actions of the council were based upon actual investigation. The preamble to the resolution so states: "Whereas, an investigation has been made of housing in the City of Huntington, which discloses substandard conditions,

which, in the interest of the public welfare should be corrected." It is not the province of this Court to disturb this factual finding, or say that the council did not in fact make the investigation it claims in its ordinance to have made. Though section 7 of the act provides that the local authorities shall have the power to conduct examinations and investigations, the delegation of such power does not make mandatory the exercise thereof.

Plaintiff further says that the city's contributions and slum-clearance contracts are void and unenforceable. He urges that (a) neither of the contracts is authorized by statutory provisions; (b) the contracts are prohibited by section 26, chapter 67, Acts 2d Ex. Sess., 1933, and (c) Art. X, Section 8 of the Constitution of West Virginia; (d) they deprive plaintiff of his property without compensation and due process of law; and (e) the city's contributions contract deprives plaintiff of the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States. These five grounds of attack will be discussed *seriatim*.

(a) It is argued that the city's contributions and slum-clearance contracts are not authorized by any statutory provision. Counsel says that the obligations under these contracts are purely contractual and not based upon any governmental relationship. Contractual or governmental, it seems sufficient to say that they were incurred by the city in furtherance of the exercise of its police power. In the furtherance of this purpose, the city has called into exercise the statutory powers which it has under its charter (Chapter 161, Acts of the West Virginia Legislature, 2d Ex. Sess., 1933), to furnish and repair sewer facilities and to repair streets, alleys and roads (sections 43, 45 and 46), and abate nuisances. (Section 34). Moreover, section 7 of the West Virginia Housing Act empowers local housing authorities "to cooperate with any city or regional planning agency, to prepare, carry out and operate projects; to provide for the construction, reconstruction, improvement, alteration or repair of any project or any part thereof * * *." And finally, its con-

tractual obligation under the contracts was a necessary inducement and consideration for the benefits which the city itself will receive under the contracts from the United States Government.

But it is said that the city has no power to enter into a slum-clearance contract because the United States Housing Act was enacted after the enactment of the West Virginia statute. This objection is of little moment. In *Williamson* v. *Housing Authority of Augusta, supra,* the Supreme Court of Georgia sustained a local low-cost-housing and slum-clearance contract between a local housing authority established under the Georgia housing acts enacted respectively March 30 and 31, 1937 (Georgia Laws 1937), with the United States Housing Authority, though the United States Housing Act did not come into being until September 1st of the same year.

(b) and (c). The contracts are not violative, as counsel suggests, of section 26 of chapter 67, Acts 2d Ex. Sess., 1933, and West Virginia Constitution, Art. X, Section 8. Section 26, aforesaid, provides:

> "A local fiscal body shall not expend money or incur obligations:
>
> (1) In an unauthorized manner;
>
> (2) For an unauthorized purpose;
>
> (3) In excess of the amount allocated to the fund in the levy order;
>
> (4) In excess of funds available for current expenses."

Article X, Section 8 of the Constitution of West Virginia reads in part:

> "No * * * municipal corporation * * * shall hereafter be allowed to become indebted in any manner, or for any purpose, to an amount, including existing indebtedness, in the aggregate, exceeding five per centum on the value of the taxable property therein * * *; Provided, That no debt shall be contracted under this section, unless all questions connected with the same, shall have

been first submitted to a vote of the people, and have received three-fifths of all the votes cast for and against the same."

It is here contended that the contracts between the city and the housing authority violate both of the foregoing statutory and constitutional provisions. These contentions are premised upon the thought that the contracts provide for the expenditure of money and the incurrence of indebtedness by the city. An examination of the contracts, however, does not sustain this premise. In the first place, section 14 of the West Virginia act and section 5 of the United States Housing Act provide that the projects contemplated by these acts shall be tax exempt, and the preamble to the contributions contract between the United States Housing Authority and the defendant authority recites that the United States Housing Authority has determined that the tax exemptions on the projects when completed will amount to local annual contributions which will equal at least twenty per centum of the annual contributions to be provided by the United States Housing Authority. Thus, the twenty per centum local contributions provided by section 11 of the United States Housing Act does not involve the expenditure of any money by the city. But, it is claimed that the slum clearance, contemplated by the contract, will require monetary expenditure. The city's slum clearance contract, authorized by the ordinance of July 11, 1938, provides that the city will effectuate the slum clearance in one of the following ways, or partly in one of these ways and partly in another:

"(a) By demolishing dwelling units which are on land acquired by the City by purchase or otherwise, including demolition of such dwelling units on land purchased for any public uses; for land purchased for right-of-way for the flood wall; and

"(b) By causing the compulsory demolition effective closing or repair or improvement of such unsafe or insanitary dwelling units, or

"(c) By inducing owners voluntarily to eliminate such dwelling units."

Thus, the elimination of substandard houses may take place in any one or more of three ways. The abolishment of dwellings on city property can hardly require any expenditure of money. Section 34 of the city charter, contained in Chapter 161, Acts West Virginia Legislature, 2d Ex. Sess., 1933, provides for the compulsory abatement of nuisances by the removal of any building or structure which constitutes a nuisance. The charter further provides that the expense of removing a building or structure which is a nuisance is to be paid by the property owner. The voluntary elimination of dwelling units, of course, would entail no expense to the city, and it is not improbable that owners may voluntarily remove unsafe and insanitary buildings in view of the fact that they may prefer to abate the nuisance themselves, rather than have the abatement accomplished by public authorities. Thus, there being no expenditure of money necessarily required by the instant contracts we are unable to see in what manner there will be a violation either of the statute governing the expenditure of money and the incurrence of obligations by fiscal bodies (section 26 of chapter 67, Acts 2d Ex. Sess., 1933), and Section 8, Art. X of the West Virginia Constitution. In this regard, it is well to note that section 10 of the West Virginia Housing Act provides that "No indebtedness of any nature of an authority shall constitute a debt or obligation of a municipality or the state or any other subdivision or agency or instrumentality thereof, or a charge against any property of such municipality, the state, or other subdivision, agency or instrumentality thereof."

A report of the United States Housing Authority of December 22, 1938, contained in the Congressional Record, estimating the city's contribution at $38,535.00, is relied upon. This report, however, does not necessarily create or suggest any obligation to pay cash. To hold a statute unconstitutional, something more than possibility that it violates a provision of the constitution is required. The showing of unconstitutionality must be clear. Both the tax exemption and the furnishing of services by the city

are its contributions toward the projects. In fact, the contributions contract between the United States Housing Authority and defendant authority, as heretofore stated, recites that the tax exemption at least equals the twenty per centum contributions required by section 6 of the United States Act.

(d) That the contracts do not deprive the plaintiff of his property without compensation and without due process of law raises questions which have already been discussed in this opinion.

(e) The city's contributions contract does not, as plaintiff suggests, deprive him of the equal protection of the laws. The Fourteenth Amendment to the Constitution of the United States provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." It is said that the city, by furnishing five hundred families, who will be admitted to the dwelling units when completed, services for which the plaintiff and other citizens must pay, will result in a violation of this provision of the Fourteenth Amendment. This Court, however, realizes fully that slums are a great detriment and their clearance and the erection of sanitary houses in their stead will inure to the benefit of all the people of the community. That incidentally five hundred families will be benefited in a slight degree more than the rest of the community does not of itself constitute a denial of equal protection of the laws. Many municipal enterprises, though used by only a part of the people of the community, are, nevertheless, public property, and have been made in the interest of all the people of the community; for example, jails, poor houses, filtration plants, gas plants and public hospitals.

Plaintiff finally says that the tax exemption provided by the city's contributions contract and section 14 of the West Virginia Housing Act is void and in violation of Art. X of the West Virginia Constitution. Section 1 of said Article X empowers the legislature to exempt from taxation certain property, including "public property." This section of the Constitution did not of itself make the

exemption. *Prichard* v. *The County Court of Kanawha County*, 109 W. Va. 479, 155 S. E. 542. Section 14 of the West Virginia act supplies the necessary legislative action as follows:

> "The authority shall be exempt from the payment of any taxes or fees to the state or any subdivision thereof, or to any officer or employee of the state or any subdivision thereof. The property of an authority shall be exempt from all local and municipal taxes. Bonds, notes, debentures and other evidences of indebtedness of an authority are declared to be issued for a public purpose and to be public instrumentalities and, together with interest thereon, shall be exempt from taxes."

The projects in question, when completed, will not belong to the tenants therein. On the contrary, the legal title will be held by the housing authority for a public purpose. They are public property within the meaning of the West Virginia Constitution, and should be exempt from taxation. The Supreme Court of Louisiana, in *State ex rel. Porterie, Atty. Gen.* v. *Housing Authority of New Orleans, supra,* held that the property of housing authorities is public property under Section 4, Art. X of the Louisiana Constitution, which provides for the exemption from taxation of "All public property." As to the exemption of property belonging to housing authorities, see generally, *Marvin* v. *Housing Authority of Jacksonville, supra; Williamson* v. *Housing Authority of Augusta, supra; Dornan* v. *Philadelphia Housing Authority, supra; McNulty* v. *Owens, Judge, supra; Krause* v. *Peoria Housing Authority, supra; Knoxville Housing Authority, Inc.,* v. *City of Knoxville, supra.*

On the question of tax exemption, we must keep in mind that the projects are made possible only by the use of United States funds and credit. The local housing authority holds title thereto subject to the statutory control and supervision of the United States Housing Authority, a branch of the United States Government. In the latter authority, resides the power to foreclose in the

event the contracts between it and the local authority are breached. Generally, the state or its municipalities cannot assess for local improvements property belonging to the United States Government. 2 Elliott, Roads and Streets (4th Ed.), section 677. This rule has been held to apply also to property upon which the United States has a lien securing a debt due to it. *Copp et als.* v. *State of West Virginia,* 69 W. Va. 439, 71 S. E. 580, 35 L. R. A. (N. S.) 669.

Permeating plaintiff's brief, we find the suggestion that the proposed projects are not feasible or practicable in that persons occupying slum areas will be unable to occupy the new units. The arguments advanced seem slightly attenuated. At most, they involve legislative policy, not clearly wrong under the status of the present record, and therefore beyond judicial province. Gray, Limitations of Taxing Power, sec. 176; *Chicago, etc., R. Co.* v. *McGuire,* 219 U. S. 549, 569, 55 L. Ed. 328, 31 S. Ct. 259.

The foregoing, we think, disposes of the material objections to the projects in question, contained in the amended bill of complaint and plaintiff's brief. We see no error in the rulings of the trial chancellor.

For the foregoing reasons, the rulings of the trial chancellor are affirmed.

*Rulings affirmed.*

HATCHER, JUDGE, dissenting:

The majority opinion fails to state certain allegations in the amended bill, which seem to me very material, to-wit:

(a) That upon information and belief the council made no investigation of the needs for slum clearance or low cost housing in Huntington prior to the resolution of January 24, 1938, and that the finding in the resolution is not based upon fact.

(b) That during a building boom in Huntington in the years 1923 to 1925, such numbers of moderately priced dwellings were built, that since then and at this

time there is an ample supply of houses with room space equivalent to that which would be provided by the units proposed to be constructed by the defendant authority, available to persons of the income class to whom the proposed units will be rented; that such dwellings have "modern plumbing, bathrooms, hot and cold running water, heat, and electric light wiring, and are in every sense of the terms safe, decent and sanitary houses"; that a recent survey shows 559 such vacant dwelling units in the city, 329 of which have space and rent for prices equivalent to the proposed units; and that the number of such vacant houses is rapidly increasing because a great number of new dwellings are now being constructed in the city through federal aid to homeowners.

Taking these allegations and others well pleaded which are recited in the majority opinion as true—and they should be so taken on demurrer—then there is no necessity for the proposed units, and the action of the city in regard thereto is arbitrarily and unwarranted. The power of courts to interfere in such case is recognized in *Holswade* v. *Huntington,* 96 W. Va. 124, 122 S. E. 449; *Bradentown* v. *State,* 88 Fla. 381, 102 So. 556, 557, 32 A. L. R. 1297; *LeFeber* v. *West Allis,* 119 Wis. 608, 97 N. W. 203, 100 Am. St. Rep. 917; *Chan Sing* v. *Astoria,* 79 Ore. 411; 155 Pac. 378; and *Mugler* v. *Kansas,* 123 U. S. 623, 661, 8 St. Ct. 273, 297, 31 L. Ed. 205, wherein the following unmistakable language is employed: "The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

I would overrule the demurrer.

MAXWELL, JUDGE, dissenting:

A recitation of fact in a municipal ordinance is not beyond challenge by a litigant in a court of equity. In my judgment, the allegations of the bill are amply sufficient to require an evidentiary test of the councilmanic recital whereon the housing project is based.

If there does not actually exist in Huntington the necessity for slum clearance and a governmental building program, then the undertaking which this suit draws in question should not proceed to consummation. There should be opportunity for a basic investigation such as the plaintiff seeks and the court refuses. In the light of the sworn bill, I am loath to close the door against the revealing light of full inquiry.

Being of opinion that the bill makes a *prima facie* case against the project under attack, I would overrule the demurrer.