Blumenschein, Appellant, *v.* Pittsburgh Housing Authority.

Argued October 8, 1954. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Harry Alan Sherman,* for appellants.

*Everett E. Utterback,* with him *William H. Mendlow,* for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, November 22, 1954:

Plaintiffs, on behalf of themselves as taxpayers and all other persons similarly affected, filed a complaint in equity to enjoin the Housing Authority of the City of Pittsburgh from taking by eminent domain their properties located on a certain site selected by the Authority for a public housing project. An answer having been filed and hearing held, the Chancellor dismissed the complaint. Plaintiffs' exceptions were dismissed by the court en banc, and from its final decree plaintiffs now appeal.

In August, 1949, the Housing Authority of the City of Pittsburgh, operating under the Housing Authorities Law of May 28, 1937, P.L. 955, as amended, passed a resolution authorizing the execution of a formal application to the Public Housing Administration for a two-year program consisting of 5,000 dwelling units of low-rent public housing and for a preliminary loan in the amount of $650,000 to cover the cost of surveys and planning in connection with the development of the program. This application declared that there was a need for low-rent housing in the City of Pittsburgh which was not being met by private enterprise, and it contained information required by the Public Housing Administration in order to guide it in determining the need of the Housing Authority of the City of Pittsburgh as compared to the need of other local Housing Authorities. Thereupon the City Council of Pittsburgh passed a resolution approving this application and likewise declaring that there existed in the City of Pittsburgh a need for low-rent public housing. The Public Housing Administration (which is an agency of the United States Government administering the federal government program of public housing in accordance with the United States Housing Act of September 1, 1937, c. 896, 50 Stat. 888 et seq., 42 U.S.C.A. §1401 et seq., as amended) approved the application for preliminary loan and made a program reservation for 5,000 low-rent dwelling units of which 3,000 units were listed for the first year's program and 2,000 units for the second year. The City of Pittsburgh, the School District of Pittsburgh, the County of Allegheny, and the County of Allegheny Institution District each passed resolutions authorizing the execution of cooperation agreements with the Housing Authority; the agreement with the City of Pittsburgh provided that the City would furnish certain municipal services, aid

in an equivalent elimination program, and make such changes in zoning as were reasonable and necessary; it provided also for payments by the Authority in lieu of taxes.

After considering twelve possible sites for projects the Board of the Housing Authority approved three of them, namely, the Bedford Avenue site located in the "Hill District" of the City, the Henger Hill site located in the "South Side" of the City, and the Summer Hill site located in the "North Side" of the City, the last named being the one involved in the present litigation and for which there was planned the construction of 1,984 dwelling units. The Housing Authority caused a topographical, property line and utilities survey to be conducted on this site, whereupon the plaintiffs, who are officers of a "North Side Protest Committee," anticipating that the properties of the residents would be condemned for purposes of the project, filed their complaint seeking an injunction against the Housing Authority from taking further action in the matter.

Plaintiffs' complaint lists a multitude of alleged illegalities in the proceedings in connection with this housing project, but they may all be reduced to three principal charges: (1) That the Board of the Housing Authority made no proper preliminary investigations or independent survey justifying their assertion that there was a need for low-rent public housing in the City of Pittsburgh, and that the alleged need which it stated in its application for program reservation was in excess of any disclosed by competent and authoritative surveys; (2) that the selection of the Summer Hill site for a housing project was arbitrary and constituted an abuse of discretion on the part of the Authority, that a so-called "Seldom Seen" site which plaintiffs proposed would be more convenient for the

persons supposed to tenant the project, and that the Authority had not held any hearings, public or private, in regard to the selection of a site; (3) that the site here in question was admittedly not a slum or blighted area and that no concomitant slum-clearance program was contemplated in connection with the project.

(1) There is no justification whatever for plaintiffs' complaint that the Housing Authority proceeded in an arbitrary, capricious manner, without any real study or investigation that naturally ought to be given to so serious a project. The learned Chancellor found— and his finding was fully justified by the evidence— that in preparing the application for program reservation the Authority properly relied upon material from the 1940 census figures as requested by the Public Housing Administration and which showed over 70,000 substandard dwellings in the City, upon excerpts from a report of the Allegheny County Conference on Community Development, upon a Report of the Bureau of Building Inspection showing the number of unsafe buildings demolished and units built during the period from 1940 to 1947, upon consultations with the Pittsburgh Housing Association, upon information obtained from the Tenant Selection Office and Management Division and from members of the technical staff of the Authority, and upon consultations with members of the staff of the Public Housing Administration. From these sources it reached the entirely justified conclusion that there existed an acute low-rent housing shortage in the City of Pittsburgh. It may be added that the Authority also consulted various public bodies in reference to problems of water supply, sewers, playgrounds and schooling, such as the City Planning Commission, the Department of Public Works, the School Board of the City of Pittsburgh, and the Bureau of

Parks and Recreation. All the data thus obtained was presented to, and considered by, the Authority at a number of meetings held during the course of almost a year. It will thus be seen that the Board acted only after securing information from various authoritative sources and holding elaborate discussions, and therefore there is no basis for the charge made by plaintiffs that its assertion of the existence of a low-rent housing shortage in the City was made arbitrarily, impetuously, or from improper motives. It is important also to bear in mind that the United States Housing Act provides (section 15) that the Public Housing Administration should not make any contract with a public housing agency for preliminary loans unless such agency had demonstrated to the satisfaction of the Administration that there was a need for such low-rent housing which was not being met by private enterprise. The fact that the Public Housing Administration approved the Housing Authority's application therefore shows that it was satisfied as to the existence of a low-rent housing need in the City of Pittsburgh.

(2) Plaintiffs claim that the Summer Hill site was a bad selection on the part of the Housing Authority because the proposed structures on that site would allegedly interfere with presently existing zoning restrictions, the schooling, church and transportation facilities would be inadequate, and the cost of the project would be excessive. They assert that the "Seldom Seen" site, the selection of which they advocated, would have been a better choice on the alleged ground that it contained only a few dilapidated structures, required no grading of any consequence, and would involve a lower cost. The "Seldom Seen" site is not on the "North Side" of Pittsburgh; the Summer Hill site, on the other hand, is within close proximity of the blighted area in that district. It consists of an irregu-

lar tract of 179 acres lying between two valleys and presently contains only 42 houses. The technical staff of the Authority made site studies of the City, taking into consideration geography, topography, proximity to schools, the number of parcels, existing dwelling units, the assessed value of lands and buildings, estimated purchase price, proposed number of dwelling units, cost per dwelling unit, and the cost of grading, sidewalks and water lines. It was found by the Chancellor that the Summer Hill site has convenient access to commercial districts, mass transportation, public utilities and schools, and, as already stated, the City, in its cooperation agreement, agreed that it would make any reasonable and necessary changes in zoning. The Board, as already stated, studied twelve sites and finally, in the careful and conscientious exercise of its judgment, approved three of them and determined that one should be located in the "North Side" of the City as being a section which contained a considerable amount of substandard housing. Indeed, whatever may be said of the merits or demerits of the site selected by the Housing Authority, plaintiffs wholly misconceive the extent of the judicial power to review the exercise of the Authority's discretion confided to it by the Legislature of the Commonwealth. The selection of a site for a large housing project necessarily involves many considerations; it is largely a question of practical judgment, common sense and sound discretion. By a host of authorities in our own [1] and other [2] juris-

---

[1] For example: *Liggett's Petition*, 291 Pa. 109, 117, 139 A. 619, 622; *Campbell v. Bellevue Borough School District*, 328 Pa. 197, 202, 195 A. 53, 55; *Floersheim Appeal*, 348 Pa. 98, 100, 34 A. 2d 62, 63, 64; *Pennsylvania Labor Relations Board v. Henry*, 361 Pa. 565, 571, 64 A. 2d 764, 767; *Triolo v. Exley*, 358 Pa. 555, 558, 57 A. 2d 878, 880; *Reininger Zoning Case*, 362 Pa. 116, 118, 66 A. 2d 225, 226; *Schenck v. Pittsburgh*, 364 Pa. 31, 35, 36, 70 A. 2d 612,

dictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion. Accordingly, all jurisdictions which have had occasion to consider the question agree that a court cannot substitute its own judgment for that of a Housing Authority as to the proper site for a housing project. In the very recent case of *Lazrow v. Philadelphia Housing Authority,* 375 Pa. 586, 592,

---

614; *Nine-Ten Chestnut Corporation v. Philadelphia Parking Authority,* 373 Pa. 274, 95 A. 2d 553; *Oliver v. Clairton,* 374 Pa. 333, 340, 341, 98 A. 2d 47, 51; *Lazrow v. Philadelphia Housing Authority,* 375 Pa. 586, 592, 101 A. 2d 664, 667.

[2] For example: *Jarrett v. Norfolk Redevelopment and Housing Authority,* 169 F. 2d 409, 411; *Matthaei v. Housing Authority of Baltimore City,* 177 Md. 506, 513, 514, 9 A. 2d 835, 838; *Stockus v. Boston Housing Authority,* 304 Mass. 507, 509-512, 24 N.E. 2d 333, 336, 337; *Brammer v. Housing Authority of Birmingham District,* 239 Ala. 280, 283, 195 So. 256, 258; *Chapman v. Huntington, W. Va., Housing Authority,* 121 W. Va. 319, 332, 333, 3 S.E. 2d 502, 509; *In re Housing Authority of City of Charlotte,* 233 N.C. 649, 656, 65 S.E. 2d 761, 766; *Neufeld v. O'Dwyer,* 79 N.Y.S. 2d 53, 61, 62.

101 A. 2d 664, 667, we approved a statement in the opinion of the court below that "It is obvious that in the absence of arbitrary or capricious action by The Philadelphia Housing Authority, its determination to select the Liddonfield Site is not subject to review by our court."

Plaintiffs' complaint that the Board of the Housing Authority held no public or private hearings in connection with the selection of the site in controversy is wholly without merit. In the first place, such a hearing *was* afforded to plaintiffs and their counsel, who did in fact present their views. But furthermore, as far as the law is concerned, there is no requirement whatever in the applicable statutes of any such hearing to be given by the Board of the Authority. The Pennsylvania Housing Authorities Law (section 10) grants to the Authority a long enumerated list of powers including (paragraph "y") the power "To conduct examinations and investigations and to hear testimony and take proof, under oath or affirmation, at public or private hearings, on any matter material for its information." The *power* thus granted is not a *mandate*. There is no provision in the law as to the manner in which the Authority is to gather the information upon which to base its action, nor is there any constitutional or other legal requirement that a landowner be granted a hearing before a governmental agency vested with the right of eminent domain determines to take his land for a public use.

(3) Admittedly the Summer Hill site was not itself a slum or blighted area and appellants apparently contend that low-rent housing can legally be constructed only upon some slum or blighted area which is being concurrently eliminated. Such is not the law. The Pennsylvania Housing Authorities Law states (section 2) that "The public purposes for which such authori-

ties shall operate shall be—(1) the clearance, replanning, and reconstruction of the areas in which slums exist; (2) the providing of safe and sanitary dwelling accommodations for persons of low income, . . . ; and (3) the accomplishment of a combination of the foregoing." In section 3 it defines "Housing Project" or "Project" as "any work or undertaking—(1) To demolish, clear or remove buildings from any slum area, . . . ; or (2) to provide decent, safe, and sanitary urban or rural dwellings, apartments or other living accommodations for persons of low income, . . . ; or (3) to accomplish a combination of the foregoing." Section 16 provides that "In the planning and location of any housing project, an Authority shall take into consideration the relationship of the project to any larger plan or long-range program for the development of the area in which the housing authority functions." Thus it will be seen that slum-clearance projects and low-rent housing projects are distinct from one another and may be entered upon either separately or in combination. It is true that, from a practical standpoint, the providing of low-rent housing is a necessary concomitant of slum elimination (*Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 225, 200 A. 834, 842). This is evidenced by the fact that the United States Housing Act of 1937, as amended, provides (section 10) that "The Administration shall not make any contract for loans (other than preliminary loans) or for annual contributions or for capital grants pursuant to this chapter with respect to any low-rent housing project initiated after March 1, 1949, unless the governing body of the locality involved has entered into an agreement with the public housing agency providing that, subsequent to the initiation of the low-rent housing project and within five years after the completion thereof, there has been or will be elimination, by dem-

olition, condemnation, effective closing, or compulsory repair or improvement, of unsafe or insanitary dwelling units situated in the locality or metropolitan area substantially equal in number to the number of newly constructed dwelling units provided by such project: . . . Provided further, That such elimination may, in the discretion of the Administration be deferred in any locality or metropolitan area where there is an acute shortage of decent, safe, or sanitary housing available to families of low income; . . . ." In the present case the Chancellor found that the Housing Authority of the City of Pittsburgh has in fact eliminated a number of substandard dwelling units equal to the number of new units it has built, as required by the United States Housing Act.

It is thus clear, therefore, that neither the Pennsylvania Housing Authorities Law nor the United States Housing Act presupposes the necessary elimination of slums prior to the building of public low-rent housing or requires the building of such housing to be on the same location as that where the slum area exists. Proper planning may well dictate the placing of the housing project in a location other than the blighted area even though the latter be eliminated only subsequently by process of demolition. As was said in *Dornan v. Philadelphia Housing Authority*, 331 Pa. 209, 225, 200 A. 834, 842: "True, it cannot be definitely proved that those who live in the tenements to be demolished will be those who, in whole or in part, will occupy the new dwellings, but the legislation is evidently planned to accomplish that result, and whether the object will be attained or not is a matter for the judgment and responsibility of the legislature." (See also *Allydonn Realty Corporation v. Holyoke Housing Authority*, 304 Mass. 288, 294, 295, 23 N.E. 2d 665, 668, 669; *Keyes v. United States*, 119 F. 2d 444, 447). That

the Housing Authority Laws do not require the Authorities to build the new low-rent housing on a slum area has been held generally in all jurisdictions: *Stockus v. Boston Housing Authority*, 304 Mass. 507, 512, 513, 24 N.E. 2d 333, 338; *Chapman v. Huntington, W. Va., Housing Authority*, 121 W. Va. 319, 334, 3 S.E. 2d 502, 509, 510; *Hogue v. Housing Authority of North Little Rock*, 201 Ark. 263, 274, 144 S.W. 2d 49, 55; *Neufeld v. O'Dwyer*, 79 N.Y.S. 2d 53, 59. *In re Housing Authority of City of Charlotte*, 233 N.C. 649, 660, 65 S.E. 2d 761, 769, it was said: "In the selection of a location for a housing project as authorized under the Housing Authorities Law, the project may be built either in a slum area which has been cleared, or upon other suitable site. The housing authority is given wide discretion in the selection and location of a site for such project. . . . And the fact that a few isolated properties in an area may be taken and dismantled which are above the standard of slum properties, or that some few desirable homes will be taken, will not affect the public character of the condemnation proceeding." In *Riggin v. Dockweiler*, 15 Cal. 2d 651, 653, 104 P. 2d 367, 368, it was said: "the statute contains no provisions making it imperative that a new housing project be located in a slum area. . . . In working out the problem of low-cost housing, it may appear that the clearance of a slum area is desirable because the dwellings in use are insanitary, or present fire hazards or are maintained under such conditions that their removal would be in the interest of the public welfare. Also, the location may be an undesirable one for dwellings. Where such circumstances exist, it would be folly to require the new buildings to be constructed at the old location, and compel the new units to be crowded into the space taken up by those cleared away. Such an interpretation of the housing act would

thwart the very purposes for which it was passed and effectively block slum clearance in districts where the problem is most acute. No such result is contemplated. Under the terms of the federal and state statutes, a housing project may be built in any location deemed desirable by those charged with their administration. The legislation was enacted to provide for low-cost housing incidental to slum clearance, but with no requirement that the new structures be confined to slum areas." In the same vein is *Housing Authority of City of Oakland v. Forbes,* 51 Cal. App. 2d 1, 6, 124 P. 2d 194, 197.

The court below concluded—and we are equally of the opinion—that the actions of the Housing Authority here in issue were not arbitrary but were based upon full and adequate information and were in conformity with the Housing Laws of both the Commonwealth of Pennsylvania and the United States, that the competent studies made by the Housing Authority clearly revealed the need for low-rent housing in the City of Pittsburgh as stated in the Authority's application for program reservation, that the Authority did not abuse its discretion in selecting the Summer Hill site for one of its housing projects but on the contrary selected it only after a thorough study of all available sites within the City, that there is no requirement of law that housing projects be built only in blighted areas, that the cooperation agreements between the Housing Authority and the various local taxing bodies were valid, that the construction of the proposed housing will not illegally deprive plaintiffs, or any residents of the site in question, of their property or other rights without due process of law, and that therefore the plaintiffs' bill in equity was properly dismissed.

Decree affirmed at cost of appellants.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion invests non-sovereign agencies with powers never intended by the founders of our Commonwealth, nor sanctioned by legislation or court decisions. It says that the "plaintiffs wholly misconceive the extent of the judicial power to review the exercise of the Authority's discretion confided to it by the Legislature of the Commonwealth." I do not share the Majority's disparagement of this Court's jurisdiction, nor is that disparagement justified by judicial precedent. In the case of *White Oak Borough Authority*, 372 Pa. 424, 427, we said only one year ago: "Neither Authorities nor Municipalities are sovereigns; they have no original or inherent or fundamental powers of sovereignty or of legislation; they have only the power and authority granted them by enabling statutory legislation." In the case of *Pittsburgh v. Pa. Pub. Utility Com.*, 171 Pa. Superior Ct. 391, 395, the Superior Court said: ". . . administrative action cannot violate the fundamental principles of fairness any more than it can impinge on any constitutional right."

The American Commonwealth would never have achieved its exalted state of democratic responsibility if government departments and administrative agencies were allowed unrestrainedly to reach out for the accomplishment of their assumed aims and objectives. Tyranny of power in its immediate application to a helpless victim can often be wielded more intolerantly by a minor official than by a monarch. The usurping decision of a zoning board which deprives a homeowner of the full enjoyment of his property can do more to make that freeholder unhappy than a tyrannical act of magnitude which generally affects the population. It is for that reason that practically every agency of government has been limited in the centrif-

ugal sweep of its activities so that it may not encroach upon inalienable rights inherent in citizenship.

Justice KEPHART, writing in *White's Appeal*, 287 Pa. 259, 267, said: "All grants of power are to be interpreted in the light of the maxims of Magna Charta and . . . those things which these maxims forbid cannot be regarded as within any grant of authority made by the people to their agents: Cooley, Const. Lim. 209." He then quoted from the eloquent statement of the Supreme Court of Texas in the case of *Spann v. Dallas,* 111 Tex. 350: "To secure their property was one of the great ends for which men entered into society. The right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural liberty—an expression of his freedom, guaranteed as inviolate by every American Bill of Rights."

In *Rolling Green Golf Club Case,* 374 Pa. 450, 452, Mr. Justice BELL, speaking for this Court, said: "For centuries in England and for over 150 years in this land whose most precious heritage was liberty, an owner of land could do anything he wished with his property provided it did not interfere with his neighbor's property or create a nuisance or violate any covenant, restriction or easement, or (in this country) violate any provision of the Federal or State Constitution. In the last quarter of a century planning commissions and zoning boards have been created and multiplied; as a result many zoning ordinances have been passed to *restrict the use of property* in a manner and to a degree which the planners thought would be best for that particular community."*

---

* Italics throughout, mine.

The plaintiffs in this case are not threatened, however, with a mere *restriction* in the use of their property but with its absolute extinction. Conceding that the law, under the State's police power and authority of eminent domain, may destroy or confiscate (with compensation) this property, this still does not mean that the defendant Housing Authority is not answerable to the Courts for infringement of constitutional prerogatives. Analyzing the Pennsylvania and Federal Housing laws of 1937, Justice HORACE STERN (now Chief Justice) said in the monumental case of *Dornan v. Phila. Housing Authority*, 331 Pa. 209, 212: "They [the Housing laws] are designed to accomplish, or at least facilitate, through the instrumentality of public agencies, the elimination in Pennsylvania of unsafe, unsanitary, inadequate and overcrowded dwellings, and to *substitute in their stead* decent habitations for persons heretofore compelled to live in slum areas." The houses owned by the plaintiffs in the instant case are not "unsafe, unsanitary, inadequate or overcrowded." On the contrary, they are beautiful homes of such architectural design and exquisite construction that they could almost fall within the classification of baronial mansions.

The elimination of slums is one of the most worthy objectives of government and it could not be better described than it has by Chief Justice STERN in the *Dornan* case already referred to: "Apart from the declarations in the Housing Authorities Law itself, the veriest tyro in the study of social conditions knows that the existence of slums is a menace to the health and happiness of the community in which they exist. Not only are they the focal centers of disease, and the likely sources of fires and accidents due to overcrowding, but they exert a pernicious moral influence upon those unfortunate enough to be obliged to live in them, and

thereby engender those proclivities of youth to crime which have been characterized by many in high places as a disgrace to our civilization. . . . Because of such considerations, our statute books, from the beginning of the Commonwealth to the present time, have been replete with enactments designed to insure the safety and the sanitary condition of dwellings, and individual houses have now and then been condemned as unsafe and been torn down by public authority. . ." But the Summer Hill development inhabited by the plaintiffs in this case is *not* a slum district. On the contrary it is a magnificent, residential area with every possible modern urban and suburban facility which can contribute to domiciliary happiness. Why destroy this admittedly perfect home site when there are numerous, unsightly slum districts in Pittsburgh crying for the dismantling pick and crowbar, the sweeping steam shovel, and the all-clearing bulldozer? The Chief Justice said further in the *Dornan* case: "It appearing that all previous attempts to rid communities of their unsafe and objectionable dwellings have proved ineffective, it is now found necessary to resort to the more drastic and comprehensive method of demolishing such structures simultaneously and over more extended areas. But, as indicated in the Housing Authorities law—and indeed it is self-evident—this cannot be done and the ultimate aim be achieved unless at the same time provision is made for sanitary and wholesome accommodations for those who will lose their homes in the process. *Certainly such persons cannot be left wholly without shelter.* . . . For the State or a municipality to tear down objectionable houses without providing better ones in their stead would be merely to force those ejected into other slums or compel them to create new ones, and the cardinal purpose of the legislation would be frustrated. As a necessary concomitant of

slum elimination, therefore, provision is made in the Housing Authorities Law for the erection, without profit, and through the enjoyment of federal subsidies, of low-cost housing projects *in which to shelter the evicted inhabitants of slum areas.*" (P. 225). Of course, this does not mean that the new project must be built on the very exact spot of the vanquished slum. It does not mean that for every weather-beaten shingle there must now be provided a nice, new brick, that for every jagged and broken slate there must be supplied a block of marble, that for every rusty nail a polished rivet must appear, and that for every corroded pump a shining spigot must sparkle with mountain spring water. It does not mean this kind of a mathematically precise exchange, but it does mean that those for whom the housing laws were enacted should find a place under the roof of the new house built to shelter the unfortunate members of a community for whom democratic government has so properly, wisely and generously provided.

In *Schenck v. Pittsburgh,* 364 Pa. 31, 37, we said: "... the Housing Authorities Law aimed more particularly at the *elimination of undesirable dwelling houses.*" It does not appear from the record in this case that the elimination of "undesirable dwelling houses" will be the result of the proposed plan. In fact, just the contrary is indicated. The effect of the current plan is to evict people who have no reason to move, to take them from their homes which they love and cherish, and compel them to journey to other places the whereabouts of which lie somewhere in the mysterious land of the unknown. And all this is being done in the name of slum clearance!

It is to be assumed that some slum-site not yet designated will eventually be demolished to counterbalance the catastrophe about to be inflicted upon

Summer Hill, but there is no guarantee that the inhabitants of the to-be-razed slum will have an opportunity to live in the houses to rise over the cemetery of Summer Hill. It would be scant comfort indeed to announce to these enlarged slum-dwellers that some other low-income citizens will become tenants in the new housing project. Closely knit as the human family is supposed to be, that kinship is not so close that the homeless wanderer will be made happy in the thought that somebody else is receiving the benefit which his government intended for him.

A bridge that crosses a river at its only fordable location must build its abutments at certain precise places regardless of property considerations. But there is no compelling necessity for such geographical pinpointing here. The bridge of humanity which the housing legislation contemplates in this particular venture can anchor its piers in at least a dozen likely places in Pittsburgh. There were introduced in evidence in the Court below pictures of one slum concentration known as Seldom Seen. This site could well be the melancholy symbolization of a slum as described in the Housing Authorities Law, to wit: "Any area in which there is a predominance of structures which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities, or any combination of these factors, are detrimental to safety, health and morals."

No one can look upon Seldom Seen without gasping in the realization that a "Tobacco Road" of such squalor could exist within the domains of one of the most attractive, successful and progressive cities in the nation. Yet, the Tobacco Road of Pittsburgh is to remain untouched (so far as present plans are known), and its Shangri-La is doomed to the tender ministrations of the "headache ball" and the bulldozer.

It is because administrative agencies are capable of such gregarious incomprehensibilities as this that the law provides for review and correction by the Courts. The Majority Opinion says that the "selection of a site for a large housing project necessarily involves many considerations; it is largely a question of practical judgment, common sense and sound discretion." Common sense at one time was supposed to designate an untutored knowledge with a rough homely application of practical measures to given situations. The phrase, over the years, has taken on a rather discriminating connotation so that, from the category of simple, uneducated thought, it has graduated into the advanced class of select wisdom. To ascribe common sense these days to anyone is to bestow on him almost the attributes of Solomonic judgment. Applying that test to the facts in the case at bar it can scarcely be said that the Housing Authority used practical judgment, common sense and sound discretion when it consigned Summer Hill to the fate of immediate annihilation and Seldom Seen to the protective shades of an ever-crumbling perpetuity.

In the *Dornan* case, Chief Justice STERN said that the "eradication of slum areas by the demolition of objectionable dwellings is the dominant background of the Housing Authorities Law." (p. 227). But here the defendant Authority is making the elimination of highly desirable dwellings the dominating factor in its operation, even though it may intend later on, as I have suggested, to raze some unknown Augean stable.

If the fact that Seldom Seen is not on the North Side constitutes a valid reason (although it is not apparent why) for excluding it from the slum clearance program, that reason would still not make Summer Hill the logical and ideal site for liquidation. What criterion was used in selecting Summer Hill for execu-

tion, while ignoring the well-known dilapidated districts on Federal Street, Lacock Street, Cajou Way, East Ohio Street (only to mention a few on the North Side) which abound with antiquated and firetrap buildings which are a menace to the health, safety and welfare of their occupants while remaining a blot on Pittsburgh's record of progress? What standard of selectivity was adopted which disregards these blighted areas, located as they are on level terrain and close to public transportation facilities, schools, churches and the down-town section; and how does that standard of selection at the same time sign the death warrant for the beautiful homes on Summer Hill, homes in which their owners have invested their life savings, homes in which they have taken such justifiable pride, and homes which redound to the credit and benefit of the North Side, as well as to the entire City of Pittsburgh? While, of course, there was no duty on the part of the defendant Authority to locate its housing project on the exact acreage of a scrofulous area, the question recurs as to whether it did not abuse its discretion in perpetuating well-known community derelicts and eyesores while destroying one of the highest class residential developments in the City.

Abuse of discretion on the part of an administrative board with tremendous power such as that entrusted to the defendant Authority is not a minor matter. As was stated in the case of *Mielcuszny v. Rosol*, 317 Pa. 91, 93: "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or illwill, as shown by the evidence or the record, discretion is abused."

I am of the opinion that the action of the defendant Authority in this case was *manifestly unreason-*

*able,* and as the Majority has approved that action, I accordingly dissent.