**Ingham v. Dodds**

*Edward M. Rea,* for plaintiffs.

*Harold H. Gorman,* for intervening plaintiffs.

*Ralph A. Cooper,* for defendant.

*Sherman K. Levine,* for intervening defendants.

HENDERSON, J., December 6, 1962.—This is a petition for declaratory judgment originally brought by the County Commissioners of Lawrence County against the county controller, which grows out of a contract entered into on July 29, 1958, by and between the County Commissioners of Lawrence County, plaintiffs, and the J. M. Cleminshaw Company, intervening plaintiffs. When the county controller served written notice on the county commissioners that he would make no payment of county funds to the intervening plaintiff under the terms of the said contract, the county commissioners then instituted this suit asking for a declaration by the court that the contract is a legally good and valid contract, asking that the county controller be directed to comply with the terms of the contract and asking that the county controller be directed to make payment in accordance with the terms of the said contract.

The legislature of the Commonwealth of Pennsylvania has enacted a law entitled "Assessments in Counties of Fourth to Eighth Classes," making it mandatory for each of the counties of such classes to evaluate all real estate and property lying within the county so as to accomplish equalization of assessments and uniformity of taxation and to establish a permanent tax records system in and for the county.

In pursuance to that legislation, the Board of Commissioners of Lawrence County who were in office at the time entered into three contracts with Lloyd H. Mullen for the purpose of complying with the requirements of that legislation. Those contracts are dated October 31, 1953, March 11, 1955, and July 24, 1956. The Mullen contracts were completed during the year 1956 and the board of county commissioners who instituted this suit went into office in January of 1957. On July 28, 1958, the then county commissioners entered into the contract in question with William Cleminshaw and Harvey G. Cleminshaw, trading as the J. M. Cleminshaw Company, for the purposes of complying with the aforementioned legislation requiring equalization of assessments, uniformity of taxation and the establishment of a permanent tax records system for the county. Some time thereafter the county controller officially notified the county commissioners that he would make no payments under the contract and this action was filed on November 26, 1958.

On December 9, 1958, defendant county controller filed a pleading in the nature of a preliminary objection asking that the court not take jurisdiction of the declaratory judgment action and alleging that relief in this matter should be by way of mandamus. On January 29, 1959, the county controller's answer raising questions of law was dismissed and an answer on the merits was directed to be filed. This answer was filed on February 20, 1959, and some testimony was taken on April 29, 1959. During the taking of this testimony, the court granted a motion for continuance in order that the parties might consolidate and summarize the evidence and no further action was taken until July 17, 1962, and July 18, 1962, at which time the balance of the testimony was taken. The matter has since been argued and is now ripe for decision.

In conformity with article IX, section 1, of the Constitution of the Commonwealth of Pennsylvania which provides that "all taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax" and, recognizing that in many instances the tax system throughout the Commonwealth was not in conformity with this requirement, the legislature passed the Act of May 21, 1943, P. L. 571, which was subsequently supplemented and amended, which required that not later than January 1, 1958, a permanent records system should be installed in each of the counties, this system to consist of tax maps, property record cards and property owners' index, together with such additional maps, materials and manuals as were deemed to be necessary. The Lawrence County Commissioners who were in office prior to the board which instituted this suit, as the responsible managers and administrators of the fiscal affairs of the county, attempted to follow the provisions of this act by entering into the Mullen's contracts. "The county commissioners shall be the responsible managers and administrators of the fiscal affairs of their respective counties in accordance with the provisions of this act and other applicable law": Act of August 9, 1955, P. L. 323, sec. 1701, 16 PS §1701.

That the county commissioners are the proper municipal authorities to enter into contracts such as this is seen from the Act of August 9, 1955, P. L. 323, sec. 1801, 16 PS §1801. With regard to the power to contract to install a permanent records system and thereafter keep it current it is specifically provided that "the board is hereby authorized and empowered to enter into such contracts as may be necessary to establish the permanent records system herein provided for or may, through its chief assessor and staff or any other county employees, prepare and complete such system": The Fourth to Eighth Class County Assessment Law of

May 21, 1943, P. L. 571, sec. 306, as supplemented and amended. We not only find then that the obligation rests upon the county commissioners to install the statutory system from which uniformity of assessments can be insured but they also have the power and duty to enter into contracts, if necessary, to accomplish this purpose.

Defendant takes the position that the county commissioners do not have the right to contract more than one time for outside help in establishing a permanent records system. His position is that once a permanent records system has been installed, the duty then lies with the chief assessor and the board to not only set up therefrom the uniformity of assessments but also to maintain that uniformity. His reasoning for this is that it is the overall intention of the act to establish a system with some degree of permanency and not one which can be revised by every board of county commissioners which may take office.

In this regard we find no restriction on the board as to its ability to contract for services such as this only during that period of time prior to the original installation of a permanent records system. On the other hand, we find in the section of the statute cited above providing for the establishment of the permanent records system a specific authorization and empowering of the board to enter into such contracts (plural) as may be necessary. Defendant would have us rule that many separate contracts may be entered into for the establishment of the permanent records system (as in the present case he made payment under three Mullen's contracts), but would have us refuse to permit any outside contract to revise and maintain the system after it has been installed or to reestablish the system where it is found to be incorrectly done in the first instance. Subsection (a) of the above quoted statute not only requires that the commissioners establish such a system

but also requires that it be kept current. This is a duty placed upon the commissioners and is of such a nature that we find no restriction, because of the complexity and detailed work involved, that the commissioners be required to do such work through their own staff.

It is obvious to this court that the work done under the Mullen's contracts did not result in uniformity of assessment throughout the county as is required by the act, and therefore we find the commissioners to be in the same position with regard to fulfilling their legal duty as the position in which they were prior to entering into those contracts.

The board takes the position that the procedures for correction of assessments which are placed upon it by the statute can be taken only after the equalization program has been put into effect, and it is obvious from the testimony that the statutorily required equalization and uniformity have never been in effect in this county.

It cannot be questioned that the overall intention of the act is that a permanent records system conforming to the act itself be established which will result in uniformity of assessment. It certainly must follow that if a faulty permanent records system is installed which does not result in such uniformity, then the intention of the act would require that a new permanent records system be installed which does result in this, and the act specifically provides for contracting outside help to do so.

We find from the testimony in this case that the permanent records system and assessment procedures and methods set up thereunder from the materials furnished under the Mullen's contracts do not provide for uniformity of assessment, and, therefore, find that the permanent records system presently in use does not conform to the requirements of the act.

It is agreed by all parties herein that the present system does not provide the statutorily required uniformity. Defendant's brief states "it is agreed that the present system needs revision and correction and our only interest at this time is to determine how this correction can be made within the law. It is not our desire to perpetuate error but rather to arrive at a proper and uniform assessment of all properties in accordance with the law and with least expense to the county." The brief for the intervening defendants states "we admit that the final assessment figures, in dollars, placed upon land and buildings in Lawrence County by the Chief Assessor and the Board are inequitable, have no relation to uniformity, and should have been changed long ago." (The court understands that defendant's and intervening defendants' only interest in this action is to determine how the proper corrections can be made within the law at the least expense to the county and finds this to be commendable.)

Therefore, if the resultant lack of uniformity in assessment results from the work performed under the Mullen's contracts in preparation of the permanent records system, which we have found to be the situation, the board then has the right in its discretion to contract again with an outside source for the establishment of a permanent records system which will result in the required uniformity.

Defendant and intervening defendants, however, allege that it was an abuse of the board's discretion to contract with the intervening plaintiff for the purpose of supplying again to the county certain factual information previously supplied to it under the Mullen's contracts, and which is alleged by defendants to have been correct. Defendant and intervening defendants specifically allege that the factual information presently in the office of the chief assessor on the

property record cards is so substantially correct as to result in an abuse of the board's discretion when they contract to have this information furnished to them again. A great deal of the testimony in the 1962 hearings went to this point.

With regard to the question of whether or not the board has abused its discretion, it is alleged by defendant and intervening defendants that the burden of proof lies with the board and cite the case of Barnes and Armbruster v. Scranton Poor District, 105 Pa. Superior Ct. 149, 160 Atl. 241 (1932), as authority therefor. This case was one involving the letting of a contract to someone other than the low bidder and the court said as follows (p. 151):

"Courts should not be zealous to interfere with letting contracts, unless they are satisfied that the public has been made to suffer, either through fraud or bad faith or careless attention to business. The presumption is that the acts of executive officers are done for public good. When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden; courts can and will interfere only when it is made apparent that discretion has been abused . . ."

This holding is consistent with that found in Hibbs v. Arensberg, 276 Pa. 24, 119 Atl. 727 (1923), where the court said with regard to acts of municipal officers (p. 26):

"When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden; courts can and will interfere only when it is made apparent this discretion has been abused. Abuse of discretion does not, as a rule, come from unwise acts or mistaken judgment, but generally springs from improper influences, a disregard of duty, or a violation of law."

Therefore, under the holding of these cases, we find the burden of proof as to whether or not the board has actually abused its discretion in entering into this contract with intervening plaintiffs to be on the defendant and the intervening defendants.

Defendant takes the position that plaintiffs have abused their discretion, under the above cited cases, in that no substantial effort was made to correct erroneous or inequitable assessments and that the board has not shown a lack of ability on its own part to correct the errors in the present permanent records system. They further allege that since the act provides for a method of corrections, it also places a duty on the board to correct all errors in the system. The intervening defendants take the position that the resulting lack of uniformity in the present system does not come from a substantial amount of errors in fact in the permanent records system and that the abuse of discretion lies in the board's lack of inquiry and lack of investigation of facts prior to entering into the contract here in question. Both defendant and intervening defendants allege that the present lack of uniformity produced from the system now in force results from incorrect procedures being used by the chief assessor and the board and not from factual errors in the record, that there is sufficient data in their records to properly provide for uniformity without entering into an outside contract, and that they have abused their discretion in doing so without investigating sufficiently concerning the alleged factual errors.

The position of the plaintiffs and intervening plaintiffs in this regard is that there is insufficient information, much of which is incorrect, in their present records as furnished by the Mullen contracts to properly assess in a uniform manner, that with the present information they cannot possibly make all corrections

which would be necessary to result in a uniformity of assessment, that it would be neither efficient or economical to attempt to correct the entire assessment program as it now exists by themselves or with additional employed help, that they have been constantly besieged by complaining taxpayers and that they have made a sufficiently reasonable investigation of the facts involved, both by running a pilot program in one of the townships in the county and by investigating what other counties have been doing in this regard so as to result in their asking for court approval of this Cleminshaw contract on the basis of full and ample investigation and consideration.

After the work done under the Mullen's contract had been completed and furnished to the board and after the first set of tax statements were mailed thereafter, a great number of taxpayers immediately protested and complained to the chief assessor and to the board concerning their tax assessments.

Every witness who testified in the hearing concerning the reason why the assessments were not uniform and are inequitable testified that this reason lies, at least partially, in the materials and information furnished under the Mullen's contract in setting up the permanent records system and the procedures under which the assessments were determined from that material and information. The testimony was that a great portion of the problem herein lies in lack of information in the property record cards, unreliable measurements shown on the property record cards, improper factual information furnished on the property record cards, that hundreds of complaints resulted from this lack of information or incorrect information on the property record cards as soon as the tax cards were first sent out under this program, that the buildings and dimensions thereof were not correct on the property record cards, that errors were corrected as

they appeared from time to time and different estimates were given as to a substantial number of corrections that have been made resulting from factual errors on the cards, that a survey was run in one township and that great discrepancies in size of lots, for example, were found to exist on the property record cards.

It is true that upon the cross examination of some of these witnesses who testified concerning this, points were brought out which did weaken the direct testimony to some extent. However, we find that the burden of proof on the defendant and intervening defendants has not been met in this regard.

The testimony of a former commissioner who was one of the members of the board at the time the Cleminshaw contract was let shows that after his investigation fundamental steps which should have been taken by Mullen in preparation of the work under his contracts were grossly neglected. It was his opinion that the board, on the basis of the work furnished by the Mullen contract, could not equalize and make uniform the taxes. With regard to factual errors, he testified that measurements throughout the county are unreliable and that the board from its investigation had evidence to support this.

The chief assessor testified that he had frequent consultations with the board over these assessments and that after many such consultations, it appearing to him and to the board that uniformity could not be achieved with the present information and under the present procedures, he recommended to the board that they enter into the Cleminshaw contract.

There is in evidence a cost estimate made by the chief assessor which would show the amount of money that, in his opinion, it would take to review each of the property record cards for each property in the county, to correct and complete the proper information on these cards and to install the proper methods and procedure

for arriving at uniformity of assessment, and it is found that such cost would be comparable to having this work done under the Cleminshaw contract.

It has already been noted that what has been referred to as a pilot program of this nature was undertaken in one of the townships under the supervision of the chief assessor, that great discrepancies were found in the factual information set forth in the property record cards, and that this was used in part in determining the estimate of the cost for such a program throughout the county.

Defendant and intervening defendants point to the minutes of the board of revision meeting held on June 28, 1962, which minutes show that the board stated at that time that it did not expect to find too many factual errors in its investigation of complaints which were at that time before the board. From the testimony it now appears that their expectations in this regard were in error. The chief assessor testified that factual errors are corrected whenever brought to his attention by a complainant and that he changes the property record card and assessment for factual errors brought to his attention without a resolution of the board.

The chairman of the present board testified concerning the many complaints which they received each time tax notices are mailed, concerning the number of errors in factual information which have been brought to their attention by the complainants, and that hundreds of corrections were made in the assessments as a result therefrom. He further testified concerning having had frequent consultations with the chief assessor concerning this entire program and about the institution of the pilot program carried on in one of the townships. He testified concerning visitations which the board made to other counties to investigate and determine the reassessment experience of those other counties, some of which attempted to complete the reassessment

procedure under their own supervision and some of which contracted for this work with outside firms. It was his opinion that over and above the many incorrect assessments which were brought to the board's attention by the numerous complaints received, his investigation satisfied him that there were many incorrect assessments concerning which no complaints were received by reason of the fact that these incorrect assessments were for properties which were substantially under-assessed rather than over-assessed. The testimony further shows that the board received advice prior to entering the Cleminshaw contract from a citizen's committee of interested persons in the area who were knowledgeable in this field.

It is found, therefore, that defendant and intervening defendants have not met the burden of proof with regard to their allegation that the board abused its discretion in not making proper investigation and not fully advising itself with regard to all factors involved herein.

Defendant throughout this action has strongly maintained that a very heavy burden lies upon the board and the chief assessor to maintain the proper permanent records system and the proper procedures to achieve uniformity of assessment and taxation, and the court finds that this is so. However, the court further finds that until such permanent records system is installed correctly and containing the proper factual information and data from which uniformity may be achieved, it is obvious that neither the board nor chief assessor can achieve uniformity let alone maintain such uniformity. It is only after a proper and correct permanent records system is installed and after the correct procedures are instituted to make use of the information contained therein that the board and the chief assessor can be held to maintain the uniformity which is required by statute.

As was said in the case of Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 109 A. 2d 331 (1954) (p. 573):

"It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions . . ."

Under the ruling in the line of cases represented by this case, by the Hibbs case and Barnes case cited above, we find that there has been no abuse of discretion on the part of the board in entering into the contract here in question and that this contract is a legal and valid contract under which the county controller must approve payments in the proper manner.

There is one provision in the contract which the court has not considered in this opinion by reason of agreement reached by counsel at pretrial conference. The contract called for an initial payment of $500 by the County of Lawrence to the intervening plaintiffs upon the execution of the contract. At the time the contract was drawn, the county controller had already advised the board that he would make no payments under the contract, and this provision was specifically included in the contract in order that an issue might be raised for court determination immediately upon the controller's refusal to make this initial payment and before the intervening plaintiffs had proceeded with any work under the contract. At pretrial conference it was agreed by all parties hereto that the County of Lawrence cannot make payment in advance for services to be rendered in the future and that this $500 payment provision cannot be enforced. However, it was further agreed by all parties that for the purposes of a determination of this action, this payment clause should be omitted from all consideration.

*Order of Court*

Now, December 6, 1962, it is hereby ordered, adjudged and decreed that a certain contract by and between the County Commissioners of Lawrence County, Pennsylvania, and the J. M. Cleminshaw Company, a co-partnership, dated July 29, 1958, is a legally good and valid contract in accordance with the laws of the Commonwealth of Pennsylvania covering equalization of assessments; that the Lawrence County Commissioners acted within the scope of their authority in entering into the said contract and did not abuse their discretion by doing so; and that the County Controller of Lawrence County is hereby directed to honor that contract in all of its provisions.