596 A.2d 1174

**IFIDA HEALTH CARE GROUP, LTD., Petitioner,**

v.

**DEPARTMENT OF HEALTH, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 13, 1991.

Decided Aug. 9, 1991.

634

---

Richard B. Cappalli, for petitioner.

Christine Garvey DeLuce, Asst. Counsel, for respondent, Pennsylvania Dept. of Health.

Ernest L. Tsoules, Jr., for intervenor, Mercy/Michaels Partnership.

Reed Hamilton, for intervenor, Diversified Health Services, Inc.

Before DOYLE and PELLEGRINI, JJ., and SILVESTRI, Senior Judge.

DOYLE, Judge.

These are consolidated appeals by IFIDA Health Care Group, Ltd. (IFIDA) from two orders of the State Health Facilities Hearing Board (Board). Both orders affirm decisions of the Department of Health (Department) granting Certificate of Need (CON) applications, one to build a one-hundred-twenty-bed nursing home called Mercy Nursing and Rehabilitation Center (Mercy Center) and the other to build a one-hundred-twenty-bed nursing home called Drexel Line Nursing and Rehabilitation Center (Drexel Center). Both nursing homes are located in Delaware County. The Drexel Center was approved on June 6, 1988 and the Mercy Center on June 15, 1989.

The central issue in this case concerns the question of whether the Department acted erroneously in relying on certain CON memoranda (CON memorandum 88–23[1] for the Drexel Center and CON memorandum 89–24 for the Mercy Center[2]) in granting the CONs. As our opinion shall more fully explain, the 1988 memorandum rejected a planning formula developed by the Health Systems Agency of Southeastern Pennsylvania (HSA/SEP) called "hierarchal group clustering" and replaced it instead with a "by-county" allocation in order to determine placement of long-term care beds for the five-county Philadelphia area region known as "Region I."[3] The 1989 memorandum continued the "by-county" formula and established a table entitled "Nursing Home Bed Need in Pennsylvania Projected Through 1992." That table identified by county the number of licensed/approved beds, the general bed inventory, the

1. 18 Pa.B. 623 (1988).
2. 19 Pa.B. 370 (1989).
3. This region includes Philadelphia County, Bucks County, Chester County, Delaware County and Montgomery County.

1992 projected bed need, and the projected surplus or shortage of beds. In that table Bucks County was projected to have a 234 bed surplus; Chester, Delaware, Montgomery and Philadelphia were projected to have shortages of 33, 345, 96 and 5,111 beds respectively. Philadelphia's projected shortage is nearly half of that for the entire state of Pennsylvania (11,007). It is this bed shortage in Philadelphia County, particularly in the lower income areas of that county, which the Department seeks to obviate.

IFIDA asserts that by rejecting the hierarchical group clustering in favor of "by-county" allocation the Department acted capriciously and, in effect, illegally promulgated an amendment to the State Health Plan (SHP). It also takes issue with two of the Board's evidentiary rulings. Before addressing these issues, some additional background is useful.

Pursuant to the Health Care Facilities Act (Act), Act of July 19, 1979, P.L. 130, *as amended*, 35 P.S. §§ 448.101–448.904, the legislature authorized the use of localized planning units termed "health systems agencies" (HSA) to enhance "the orderly and economical distribution of health care resources." Section 102 of the Act, 35 P.S. § 448.102. HSAs are individual planning units. Pennsylvania was divided into nine regions each having its own HSA. Each HSA developed a document termed a Health Systems Plan (HSP) which determined for its region the need for and the desired location of additional health facilities including major medical equipment. HSA/SEP's most recent HSP (HSP/SEP) was developed in 1985.

Under this 1985 HSP, a determination as to how many long-term care beds were needed in Region I was made by utilizing the "OARS formula." This is a complicated mathematical formula applied to the population aged 65 or older to determine bed need. The formula is based upon population percentages and considers the level of physical or psychosocial impairment of the elderly and the availability of family or friends for support at home. Use of the OARS formula to compute *total* long-term bed need is not in

dispute. What is in dispute is the method the Department employed to determine *where* the beds are to be located.

IFIDA contends that by abandoning clustering in favor of a "by-county" assessment the Department departed from the formula authorized by the SHP. A distinction must be made, however, between the OARS formula which pertains to bed need and which formula is mandated under the SHP, and clustering which does not employ the OARS formula but is a methodology used to determine location of beds *after* the OARS formula determines the total number of beds needed. "Clustering" is not expressly mentioned in the SHP or the HSP/SEP. It is mentioned, however, in an appendix in the latter where it is actually termed "locational analysis." Since the two methods of determining bed placement are of concern here, we shall describe each.

Under the clustering method HSP/SEP was divided into twenty-three subareas. These clusters were geographic units which were smaller than counties and crossed county lines. The purpose of allocating beds by clusters was to locate facilities close to a patient's family and curb the tendency of locating long-term care beds only in certain more affluent areas of each county. As described by IFIDA "the cluster is a planning concept which uses several socio-demographic variables to attempt to create geographic zones like neighborhoods: the area within which people do most of their daily circulation." IFIDA's brief, p. 14. Only Region I employed the cluster method.

Other regions employed the "by-county" assessment method. Under this method each county (rather than a cluster) is the unit by which bed placement is determined. Thus, if a county is lacking in beds, a developer can build a long-term care facility anywhere in that county.

To understand fully why the Department determined that the clustering method should be abandoned, a brief review of the pertinent organizational structure of Pennsylvania's

health system is helpful.[4]   Initially, HSA's regulated health facility developers.   To build, the developer had to gain a CON review from the HSA.   After being reviewed by the HSA the CON was then examined by the Division of Need Review, a division within the Department.   The review entailed assuring that the proposed project was consistent with the SHP.   It is important to understand that a CON must *satisfy* the requirement of the SHP.   *See* Section 707(a) of the Act, 35 P.S. § 448.707(a).   HSA requirements, however, must only be *considered* by the Department. Section 707(a)(1) of the Act.

In 1986–1987 HSA's were federally defunded and ceased to exist;   responsibility for processing CON applications then passed solely to the Department.   17 Pa.B. 2098 (1987). At that time the Department determined to continue utilizing the regional HSPs.

In 1988, however, the Department changed its mind with respect to the methodology employed by Region I to determine bed location.   The rationale was explained by the Department as follows:

Each of the former health systems agencies approached the assessment of need for nursing home beds in a different manner.   The approach used by the HSA of Southeastern Pennsylvania assumed that factors most closely tied to the need for nursing home care are the level of impairment and the availability of support in the home by family or friends.   Adjustments were made for use of nursing home beds by persons under age 65, estimated migration into and out of the region, and restricted-use beds.   The HSA of Northeastern Pennsylvania initially used a needs-based, dynamic modeling method; however, the agency later abandoned it in favor of a free-market approach following rejection of the region's formula by the Statewide Health Coordinating Council (SHCC).   The HSA of Southwestern Pennsylvania developed two needs-based methods which define the popula-

---

4.   The Court commends Petitioner's counsel for taking time to lay out this useful factual background in its brief.

tion at risk as persons with major functional disability sufficient to interfere with daily living activity. A demand-based approach was used in the Northwest region. This methodology used waiting lists to approximate unmet need. The remaining five regions applied use rates by age cohorts and population projections to estimate need.

Seven of eight former health systems agencies in Pennsylvania determined the county to be an appropriate planning unit in formulation of bed need projections for institutional nursing home services. The NY–Penn HSA continues to plan on a county level.

The HSA of Southeastern Pennsylvania (HSA/SEP) selected a different methodology which it called "hierarchial group clustering", or simply "clustering". Prior to development of clustering, nursing home beds in Southeastern Pennsylvania were apportioned by county as in other regions. Apportionments were a function of the percentage of the region's elderly (65+) population living in each county. County-based apportionment, according to the agency, presented certain problems. First, nursing home developers tended to build in certain areas within counties, leaving large geographic tracts with few nursing home beds. Second, many nursing homes were being built in suburban counties on the perimeter of Philadelphia. Homes built on the perimeter, which served a largely Philadelphia population, had the effect of displacing suburban nursing home patients, thus creating a perception of bed shortages in the suburbs. The approach selected by HSA/SEP was intended to improve access to all socioeconomic groups by assuring equitable geographic distribution of beds across the region.

The Department has determined that hierarchical group clustering has not achieved its stated purposes, and is a cumbersome and expensive methodology to implement. Detailed examination of license records and certificate of need program files clearly show that new or expanded nursing home services have developed exclusively in the

suburban counties or in city census tracts with higher than average median incomes. The cluster methodology has failed to encourage uniform access to care across all socioeconomic groups, and is insensitive to the needs of the urban poor. Instances have occurred when developers with a demonstrated commitment to serving the needs of the urban poor have been denied a certificate of need on the basis of no need in a target cluster. Furthermore, the Department has determined that the methodology has neither encouraged development of new beds in areas where serious bed shortages have been identified, nor discouraged development where large surpluses of beds have been identified at the cluster level.

The county has been found to be a satisfactory planning unit in all other regions. Use of the county as the appropriate planning unit for certificate of need determinations will bring increased attention to the needs of the urban poor, and discourage further development of new nursing home beds in already overbedded counties.

18 Pa.B. 624 (1988). It is this change from clustering to "by-county" locational analysis which IFIDA challenges. It does so on the basis that the change was arbitrary and capricious and that it constituted a de facto amendment to the SHP. The Department responds that its action was an exercise, not abuse of, discretion and that because the changes were organizational in nature there has been no impermissible amendment to the SHP.

■ IFIDA first maintains that the determination to abandon clustering in favor of county-wide assessment was based upon inconclusive and underinclusive data. Testimony of the Department's witness Mr. William Dethlefs, the Department's Director of the Division of Technical Planning and Assistance, was that the key applicational table for 1985 "didn't add up" when the Department attempted "to try to reconstruct what the region was doing with their cluster methodology." This witness also testified that the urban poor in Philadelphia were not being served and that "you cannot assign a project to a given census tract from a

street address ... [y]ou have to have a census tract map in your hand and you have to be able to determine through [a] field site visit whether or not a particular location is in this census tract or in another census tract." N.T. 165.

IFIDA concedes that the numbers "do not compute," but says that this is no defense to the Department's action because it did not make "sincere" attempts to understand the problem and because it was not the "official reason" given by the Department for abandoning the policy (the official reason being that clustering was expensive, cumbersome, and had failed to meet goals).

The Board made the following findings in the Drexel Center case and they are supported by substantial evidence: [5]

13. The formula the Department used to project the figures contained in CON Memorandum 88–23 is the same HSP/SEP formula, known as the OARS formula, that was incorporated into the SHP.

14. Assessment of need by clusters is not found anywhere in the HSP/SEP bed need formula.

15. Clusters were never a part of the HSP/SEP formula, but are found only in an Appendix to the HSP/SEP, where 15 different socio-economic factors are used to determine how to establish clusters for a particular area.

16. When the Department changed from the cluster system to the counties as the planning units, it was modifying the organizational structure for allocating need, reassigning geographic areas.

17. The original purpose of the cluster methodology was to encourage developers to build in large areas of the city that did not have access to nursing home care.

18. Clusters were groupings of socio-economically similar and contiguous census tracts.

5. Substantially similar findings were made in the Mercy Center adjudication although the Drexel adjudication is the more complete. The differences are unimportant for our purposes here and IFIDA does not suggest that the results in the two cases should be different.

19. It was frequently impossible, without on-site inspection, to determine in what census tract or cluster nursing homes were located.

20. After the Health Systems Agency of Southeastern Pennsylvania (HSA) went out of existence, it was difficult for the Department's staff in Harrisburg to determine with precision nursing homes' locations in census tracts or clusters.

21. Furthermore, the Department determined that there were census tracts not assigned to any cluster.

22. Additionally, many of the clusters crossed county lines. As an example, Cluster 10, which included large portions of the impoverished areas in North Philadelphia, also included part of Montgomery County.

23. The purposes of the cluster system were easily defeated by nursing home developers who situated beds in Montgomery County but represented them as serving the needs of the urban poor.

These findings adequately demonstrate that the Department presented legally sufficient evidence to support its switch and indicate a sufficient effort to assess the problems facing Region I.

IFIDA also asserts that the Department's study was underinclusive because it failed to take into account that under the cluster methodology the surplus number of beds in certain clusters was being reduced. The fact that the Department chose to examine the data, not from the perspective that surplus clusters were being reduced, but from the perspective that deficit clusters were not being increased quickly enough, goes to its discretion. Similarly, the fact that the Department chose not to do a "cluster by cluster" profile goes to its discretion in how to select and analyze the data.

IFIDA's other complaints are equally unimpressive. The facts that developers, for their own economic benefit, would choose more affluent locations to build or would decline to build in impoverished areas because of certain reductions in Medicaid funding do not weaken the Department's rationale

for the change but, to the contrary, demonstrate that the cluster system was not a "ringing success." Finally, IFIDA maintains that the Department did not demonstrate that the county assessment system was "better." IFIDA seems to believe that it has some type of vested right in clustering and that in order to alter that methodology the Department had to demonstrate that what replaced it was better. We disagree. The Department's determination that clustering was not working adequately was within its discretion. Once it determined that and came to that conclusion, it was then free to try any system which was in harmony with the SHP and other pertinent statutory law.

In the seminal case of *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 109 A.2d 331 (1954), our Supreme Court articulated the standard to be employed when reviewing an agency's actions for abuse of discretion. It wrote:

> [C]ourts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion. (Emphasis in original.)

*Id.*, 379 Pa. at 573, 109 A.2d at 335. Under this standard, we can find no basis for reversal of the Department's action on the theory of abuse of discretion.

■ IFIDA next alleges error in the Board's refusal to admit one of its exhibits (Exhibit L), a statistical document

demonstrating, cluster-by-cluster, the addition and deletion of long-term care beds for Region I during 1983–1987 (the period when the clustering methodology was employed). The Board refused to admit the exhibit because it had not first been presented at the public hearings held by the Department. These hearings were held after the policy changes had been announced in the Pennsylvania Bulletin.

Section 506(a) of the Act, 35 P.S. § 448.506(a) pertinently states, "the board shall entertain no evidence that the hearing board is satisfied the appellant was able, by the exercise of reasonable diligence, to have submitted before the health systems agency and the department." While IFIDA argues that this document was not the type of evidence to which Section 506(a) addresses itself, we must disagree. The statute is clear and it applies to IFIDA.

■ IFIDA also asserts Board error in the preclusion of testimony by two of its proposed witnesses both of whom had been planning analysts for HSA/SEP. The testimony of those witnesses, however, would have demonstrated at most that they believed the cluster system was working. The decision, however, was not theirs to make, but the Department's and since the Department established its case, the testimony would have simply been irrelevant. An agency may properly exclude irrelevant evidence. *Silvia v. Pennhurst Center*, 63 Pa.Commonwealth Ct. 75, 437 A.2d 535 (1981).

■ Finally, IFIDA contends that the change to a "by-county" assessment constituted an amendment to the SHP which would require, *inter alia*, a period of public comment and approval by the Governor. We begin by recognizing that under the SHP the Department is required to use HSA nursing home bed projections as listed in Table 39–9. That table, which breaks the relevant data down into regions, gives totals for existing and approved beds, and HSA recommended needs, shortages or excesses.[6]

6. The pertinent part of Table 39–9 reads as follows:

Two important points must be made about this table. First, it goes no further than a regional breakdown and, second, its source is based upon 1980 HSP's and 1980–81 approved CONs. As per an amendment to the SHP, however, when a HSA or the Department obtains newer data and that data is contained in an HSP it is considered incorporated into the SHP. IFIDA contends that what this amendment should be read to mean is that HSA *formulas*, not just HSA figures, should be incorporated. While the SHP does mandate use of the OARS formula to determine the total number of beds required, it does not propose a specific formula for determining where the beds should be located. Further, the HSP/SEP does not mandate clustering. While the purposes of clustering are set forth in that plan, merely by way of explanation, they are not a part of the HSA formula for computing bed location. Thus, we believe that the Board assessed the situation correctly when it wrote in the Drexel Center adjudication:

Clusters are not part of the formula for determining need, and are not mentioned in the HSP/SEP formula. Clusters become relevant only after a need projection is calculated. Total need is calculated under the formula, and that projection is allocated to the planning units. The rejection of geographic clusters did not alter the HSP/SEP formula for projecting need.

Nor did it violate the SHP. The SHP, in Recommended Action 39.1.1.1, mandates that "[t]he Department will use the HSA nursing home bed projections show in Table 39–9 to determine whether a need exists for CON applica-

Table 39–9
HSA Nursing Home Bed Need Projections

| HSA | Existing and Approved | | | HSA Recommendation | | Projected Shortage (+)/ |
| | Beds | Ratio | Need | Ratio | Excesses | (−) |
|---|---|---|---|---|---|---|
| [Region] I | 24,553[a] | 53.8 | 26,150 | 55.8 | +1,597 | |

- - - -

(a) Includes restricted beds.

Source: 1980 HSPs and 1980–81 approved applications.

tions which propose the construction of new nursing home beds." SHP, 1982–1987, p. 797. Table 39–9 clearly shows that nursing home bed need projections are determined for an entire health service area, rather than a smaller geographic area. Had the SHP intended a sub-regional need analysis, the projections in Table 39–9 would have been similar to the sub-county need projections for pediatric or obstetrical services....

Although the SHP discusses the HSP/SEP's use of clusters, there is no SHP requirement that beds be apportioned to individual clusters. In its discussion of clusters, the SHP draws a clear distinction between a regional bed need projection and the geographic distribution of the beds that are projected to be needed.

There is no requirement that changes in policies must be effected via the amendment process, provided the Department does not change the formula for assessing need. The Department's change from a cluster system to a county assessment of need did not constitute a substantive change to the SHP, but was merely a modification of the organizational structure allocating the beds determined to be needed.

Having determined that the Board committed no error, we affirm its orders.

## ORDER

NOW, August 9, 1991, the orders of the Board in the above-captioned matters are hereby affirmed.