Interim House, Inc. *v.* Philadelphia Zoning Board of Adjustment.

City of Philadelphia *v.* Griffith Nursing Home, Inc., Sylvina A. Gray and Interim House, Inc. John Penrose, Appellant.

Argued April 3, 1978, before President Judge Bow-
MAN and Judges MENCER and ROGERS, sitting as a panel
of three.

*A. Martin Herring,* with him *Teitelman, Sagot,
Herring, Jennings & Luber,* for appellant.

*Howland W. Abramson,* with him *James M. Penny,
Jr.,* Assistant City Solicitor, *Steven Berger,* Assistant
City Solicitor, and *Leonidas A. Allen,* for appellees.

OPINION BY JUDGE ROGERS, June 9, 1978:
We affirm the final order of the Court of Common
Pleas of Philadelphia County denying a mandatory
injunction requiring the appellee Interim House, Inc.
to close its facility for treating alcoholic women, on
the able and comprehensive opinion of Judge WILLIAM
M. MARUTANI, following:

The matter presently before this Court is a petition for mandatory injunction directed against Interim House, Inc. ('Interim House'), seeking to enjoin Interim House from 'illegal use, possession and occupancy' of premises 250 West Tulpehocken Street, Philadelphia, 'as a treatment and rehabilitation center for women who prior to admission were addicted to the use of alcohol.' Petitioner is John Penrose, a resident of Philadelphia who is a 'next adjoining neighbor to Interim House.'

## FINDINGS OF FACT

1. Petitioner, John Penrose, ('petitioner' or 'Penrose') is a citizen and taxpayer in and of the City of Philadelphia, who resides on premises adjoining 250 West Tulpehocken Street, Philadelphia.

2. Interim House, Inc. ('Interim House') is a non-profit corporation incorporated under the laws of the Commonwealth of Pennsylvania, with an advance ruling dated November 14, 1973 from the Internal Revenue Service, Department of the Treasury, that Interim House is a tax exempt organization under 501 (c)(3) of the Internal Revenue Code and accordingly, until further notice, has been deemed a 509(a)(1) organization thereunder. Said advance ruling ends on June 30, 1977 unless otherwise extended or terminated. Pursuant to a lease and option to purchase agreement dated July 26, 1973 between Interim House and Griffith Nursing Home, Inc., a Pennsylvania corporation, Interim House went into occupancy of 250 West Tulpehocken, on which premises there is situated a three and one-half story detached dwelling.

3. Premises 250 West Tulpehocken Street is situate in a district zoned 'R-2' Residential. In such a zoning district, a property may be used for 'Rest, old age, nursing or convalescent homes, and nurseries' upon the issuance of a certificate.

4. Under application number 36187-H, calendar number X-1129, the said premises were approved on July 24, 1967 by the Zoning Board of Adjustment for a nursing home to contain 29 beds. Thereafter the premises were used as a nursing home into August 1973, Interim House becoming a lessee-optionee thereof by agreement dated July 26, 1973.

5. Pursuant to an application filed by Interim House for a use certificate for 'treatment and rehabilitation center for women providing live in and live out patient care' hearings were held before the Zoning Board of Adjustment on October 11, 1973 and January 17, 1974, and by a majority decision of the Zoning Board of Adjustment dated July 15, 1974 the application for the use certificate was refused.

6. Interim House thereupon filed an appeal to the Court of Common Pleas: Interim House, Inc. v. Zoning Board of Adjustment, May Term, 1974, No. 1213, appealing the Zoning Board's refusal to grant a use certificate. By Order of Judge NED L. HIRSH dated April 28, 1975, the appeal of Interim House was 'dismissed and the decision of the Zoning Board of Adjustment ... affirmed.' No appeal was taken from this Order of April 28, 1975.

7. Interim House has continued in possession of 250 West Tulpehocken Street, conducting therein activities described hereinafter. It has beds for 21 residents plus two more for

live-in house managers, all women. The only male person on the staff is its Assistant Director, William H. Johnston ('Mr. Johnston').

8. On the staff of Interim House are the following: Clara B. Synigal, Executive Director ('Mrs. Synigal'); Mr. Johnston, Assistant Director; a full-time registered nurse who works 40 hours a week from 9 a.m. to 5 p.m. daily from Monday through Friday; two persons identified as therapists, one with a master's degree in psychology, and the other working toward her bachelor's degree; one community liaison person; a home economics coordinator; one case worker; and two live-in house managers. This totals ten persons. Mrs. Synigal is a certified public accountant in Pennsylvania, has taken courses in psychotherapy and alcoholism at Rutgers University, Temple University, Johns Hopkins University and Melrose Academy, is a member of the Governor's Task Force on Alcoholism and Women (Pennsylvania), has in the past trained Department of Public Welfare Workers on the subject of alcoholism as well as spoken on the topic at various schools in the area such as Plymouth Meeting, Whitemarsh, Germantown High School, Roosevelt Jr. High School, Simon Gratz High School, etc.

In addition, Interim House has consultants or instructors including Dr. Carolyn Michaelson, M.D. to provide medical care of a doctor, an arts-and-crafts teacher, and an instructor in yoga.

9. Residents to and of Interim House are received by referrals from other treatment centers primarily for alcoholics, including Livengrin, Chit-Chat Farms, Riverside, Eagleville

Hospital, Valley Forge Hospital, Einstein Daroff Division, and Kensington Hospital. Candidates for acceptance into Interim House are first interviewed by a staff member (designated as a 'community liaison person') of Interim House and if approved at this initial interview, then received at Interim House for a 24-hour period for mutual assessment,—the patient's as well as Interim House's,—as to desirability to proceed with continued retention at Interim House. Residents are, therefore, not taken 'off the street' nor are drug addicts accepted. Continued participation by the resident in Interim House's program is voluntary.

10. The program of treatment of residents consists of administration of antabuse, instructions in personal hygiene, calisthenics, yoga exercises, psychodrama, Alcoholics Anonymous meetings, cooking, sewing, arts-and-crafts as well as group therapy, counselling and attending to a resident's physical problems, and family therapy. Interim House also has agreements with Northwest Mental Health Hospital and with Friends Hospital . . . for receiving referrals from these two institutions. There also is a program for in-service training for staff members at Interim House for which participants may receive up to eight academic credits with the Community College.

11. The accommodations and facilities on premises 250 West Tulpehocken consist of the following: (a) beds for 21 residents plus two live-in house managers, the second and third floors containing the sleeping areas; (b) offices, dining area, kitchen, two living rooms, foyer and reception areas on the first floor; (c) storage and freezer in the basement; (d)

also on the third floor, in addition to sleeping areas, two offices, a room for therapy, psychodrama, ping-pong, sewing and recreation, storage room, as well as two bathrooms. Overall, there are nine bathrooms on the premises.

12. On May 7, 1975 Interim House applied to the Department of Licenses and Inspections for a use registration permit for a nursing home for 250 West Tulpehocken, and on the same date a use permit, designated as 'USE: Nursing home', was issued.

13. It was stipulated by counsel, and the Chancellor so finds, that Interim House had applied for, but has not yet received as of the date of the hearing, a nursing home license.

14. Petitioner John Penrose prays for a 'Mandatory Injunction against Interim House . . . to cease and desist its illegal use of the premises 250 West Tulpehocken Street. . . .'

## DISCUSSION

While the ultimate issue to be decided is whether or not Interim House's activities conducted at the premises in question come within the meaning of 'nursing' as set forth in the Philadelphia Code §14-203(2)(h), it is first necessary to consider whether or not the Order of Judge HIRSH entered on April 28, 1975, from which no appeal had been taken, operates either as res judicata or as collateral estoppel against Interim House in the present posture of this case. The two legal bars were recently reiterated in Safeguard Mutual Insurance Company v. Williams [463] Pa. [567], [547], 345 A.2d 664, 668 (1975), as follows:

'[F]or the doctrine of res judicata to prevail there must be a concurrence of four

conditions: 1) identity of issues, 2) identity of causes of action, 3) identity of persons and parties to the action, and 4) identity of the quality or capacity of the parties suing or sued. [Citations omitted.] With respect to collateral estoppel . . . a plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action. [Citation omitted.]'

Applying either of these two standards to the facts in the instant proceeding, the only criterion open to any question appears to be identity of issues: whether 'the issue [which] had been decided in the prior adjudication was identical with the one [now being] presented [here] in the later action.' Indeed, as enunciated in Callery v. Blythe Township Municipal Authority, 432 Pa. 307, 312 (1968):

'The essential inquiry is *whether the ultimate and controlling issues have been decided* in a prior proceeding in which the present parties had an opportunity to appear and assert their rights. [Citation omitted.]' (Emphasis added.)

The resolution of this question requires an examination of precisely what, in fact, were the controlling issues that had been decided in prior proceedings, and whether those same is-

sues are dispositive of the questions presented here.

According to the Findings of Fact entered by the Zoning Board of Adjustment on July 15, 1974, the application filed by Interim House was—

'. . . for a treatment and rehabilitation center for women who have been on alcohol providing live in and live out patient care in the subject premises.'

From the record in this case, including a reading of the 'Findings of the Zoning Board of Adjustment', we are unable to determine whether the Zoning Board of Adjustment viewed this application as 1) one coming within a certification application, more specifically §14-203(2)(h) of the Philadelphia Code providing for—

'(h) Rest, old age, nursing or convalescent homes, and nurseries;'

or 2) as a proposed use which is nowhere authorized under §14-203. Indeed, the opinion of the Zoning Board of Adjustment, in this respect, appears, at best, ambivalent: under paragraph 2 of its 'Conclusions of Law' the Board appears to indicate that the proposed use is nowhere authorized 'in a district zoned "R-2" Residential. . . .' If such proposed use was considered as one not authorized or permitted at all under §14-203 of the Philadelphia Code, such would appear, without more, to be dispositive of the application. The ambivalence and, therefrom, the confusion arises, at this point, by reason of the Board also referring to its denial of a 'grant of a certificate'. We refer to the actions of the Board only for the purpose of seeking to ascertain what issues had in fact been decided in those proceedings, as affirmed

by Judge Hirsh's order, and not as an attempt to re-open or otherwise to 'review the actions of governmental bodies or administrative tribunals' or to substitute judicial discretion for administrative discretion: Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 573 (1954). The decision of the Board, affirmed by Judge Hirsh, is final. The open question, or at least unclear point, is: final as to what issue?

If the Board's decision was grounded upon the premise that Interim House had applied for a certificate under §14-203(2)(h) of the Philadelphia Code, namely for '[r]est, old age, nursing or convalescent homes, and nurseries', then the denial by the Board must stand as a bar, without more, to Interim House's current efforts to operate under a permit as a 'nursing home'. However, as indicated hereinbefore, the record, at best, is ambivalent if not conflicting. Under the circumstances we are, therefore, compelled to look for guidance to other governing principles of law.[1]

---

[1] Further on the subject of res adjudicata, Judge MARUTANI made the following formal Conclusions of Law:

3. By its decision dated July 15, 1974, the Zoning Board of Adjustment denied Interim House's application for 'treatment and rehabilitation center for women providing live in and live out patient care' and such decision was affirmed by Order of Judge NED L. HIRSH by Order dated April 28, 1975, from which last Order no appeal was taken by any party.

4. The denial by the Zoning Board of Adjustment of the aforementioned application by Interim House was based upon the conclusion that such 'use is not permitted in a district zoned "R-2" Residential, being violative of the provisions of Section 14-203 of the Philadelphia Zoning Ordinance. . . .'; conversely, such denial was not based upon

'[R]es judicata should be applied sparingly in the area of zoning': Schubach v. Silver, [461] Pa. [366], [376] 336 A.2d 328, 333 (1975). '[R]estrictions on a property owner's right to free use of his property must be strictly construed and all doubts resolved in his favor': Gilden Appeal, 406 Pa. 484, 492 (1962); accord: Delaware County Community College Appeal, 435 Pa. 264 (1969).

While the Court, sitting as chancellor, might well remand this entire matter back to the Zoning Board of Adjustment for further consideration and clarification to determine whether or not the same result, denying the application, might be reached under an explicit application of 'nursing home', by reason of a number of considerations applicable here, we feel constrained to meet and decide the basis issue.

'Whether a proposed use, as factually described in an application or in testimony, falls within a given category specified in a zoning ordinance is a question of law and subject to review on that basis. [Citations omitted.] The issue becomes one of statutory construction, and the function of a reviewing court is to determine the intent of the legislative body which enacted the legislation': Crary Home v.

---

an application for one of the specified uses set forth in the Philadelphia Code, specifically §14-203(2)(h). 'Rest, old age, nursing or convalescent homes, and nurseries', more specifically 'nursing home'.

Whether the identity of the issue of the earlier litigation was merely unclear, as mentioned in Judge MARUTANI's Discussion, or whether the issue was that described in his Conclusions of Law, the appellant Penrose having had the burden of proof of his claim of res adjudicata, must lose on this point.

DeFrees, 16 Pa. Commonwealth Ct. 181, 184, 329 A.2d 874, 876 (1974).

There is before this Court the testimony and record from the Zoning Board of Adjustment as well as additional testimony received in a hearing before the Court; moreover, there are considerations of speedy disposition of matters as well as avoidance of potential subsequent delays that may be occasioned by further appeals from the Zoning Board of Adjustment were this matter to be remanded to the Board.

We conclude that a sufficient record exists for the Court to view this matter as presenting a 'question of law', a question of statutory construction: specifically whether the activities of Interim House fall within the category of 'nursing home' within the meaning of the Philadelphia Code.

Preliminarily, referring to the Public Welfare Code, the following definition is noted:

   ' "Nursing home" means any premises operated for profit in which nursing care and related medical or other health services are provided, for a period exceeding twenty-four hours, for two or more individuals, who are not relatives of the operator, who are not acutely ill and not in need of hospitalization, but who, because of age, illness, disease, injury, convalescence or physical or mental infirmity need such care.' Act of June 13, 1967, P.L.   , No. 21, art. 10, §1001; 62 P.S. §1001.

The regulations promulgated pursuant to the Public Welfare Code contain the following further definitions:

*'Nursing care*—A planned program to meet the physical and emotional needs of the patient, and shall include procedures that require nursing skills and techniques applied by properly trained personnel.

*'Skilled nursing care*—High intensity comprehensive, planned care provided with maximum efficiency by registered professional nurse in instances where her judgment is required, or by a licensed practical nurse under professional nurse supervision.

*'Skilled nursing facility*—Any premises in which nursing care and related medical or other health services are provided, for a period exceeding 24 hours, for two or more individuals, who are not relatives of the operator and not in need of hospitalization, but who, because of age, illness, disease, injury, convalescence or physical or mental infirmity need such care.' 28 Pa. Code §201.3.

Webster's Third New International Dictionary (unabridged), defines nursing home as:

'1. *chiefly Brit*: a private hospital

'2. a private home or other place where maintenance and personal or nursing care are provided for three or more persons who are unable to care for themselves properly.'

Research has failed to yield any Pennsylvania decisions defining 'nursing home', in more particular under the Philadelphia Code. Thus, while neither the definitions set forth in the statute and regulations relating to licensing nor in the dictionary are controlling, under the cir-

cumstances they may provide some guidance in the absence of any other definition.[2]

In terms of staffing, Interim House would appear to have sufficient qualified persons to meet the requirement of availability of appropriate medical attention for a 'nursing home' within the meaning of the present legal issue:[3] it has a full-time registered nurse; two therapists, one with a master's degree in psychology with the other working toward her bachelor's degree; a home economics coordinator; a case worker, as well as Mr. Synigal with experience, formal as well as by experience and training, in the area of alcoholism. In addition, Interim House not only has working relationships with some hospitals and institutions in the immediate surrounding area, but also retains outside consultants, including a physician, as well as instructors.

---

[2] The appellants argue that Interim House, Inc.'s facility does not satisfy all of the requirements for a nursing home under the Welfare Code and that it is therefore not a nursing home for zoning purposes. We agree with Judge MARUTANI that while provisions in the Welfare Code may be helpful in determining whether the proposed use is a nursing home within the meaning of the zoning ordinance, they are not controlling. The liberal interpretation which is required to be given the allowance of uses in zoning ordinances does not admit of giving conclusive effect to other statutes regulating such uses in the interest of the consuming public.

[3] We note that Section 14-203(2)(h) of the Philadelphia Code permits convalescent homes as well as nursing homes in the R-2 Residential district. Webster's Third New International Dictionary (unabridged) offers the following definitions:

Convalescent: one recovering from sickness.

Convalescent home: an institution for the care of convalescing patients.

The modern view is that alcoholism is an illness.

Turning next to the activities at Interim House conducted on behalf of its residents disabled by alcoholism, and again weighing such activities for the sole purpose of determining whether such activities come within the meaning of 'nursing home' as contained in the Philadelphia Code §14-203(2)(h), we find a broad spectrum: group therapy, counselling, psychodrama, instructions in personal hygiene, bodily exercises, medical attention, as well as recreational training including sewing, cooking, pingpong, and arts-and-crafts.

We are persuaded that the staffing and the program of Interim House amply qualify it as a 'nursing home' within the meaning of the Philadelphia Code, §14-203(2)(h). To measure its staff facilities and its activities for treatment of persons disabled by alcoholism, by the usual familiar standards of the traditional nursing home,—with predominantly bed-ridden, aged senior citizens, or residents recuperating from surgery, etc.,—would be a static perception. As expressed in Gage Zoning Case, 402 Pa. 244, 249 (1961):

'The care, maintenance and cure of those who are ill is as much a matter of concern for organized society as the building and maintenance of homes for those who are well and able bodied. The citizenship of a person who becomes ill loses none of its vigor because of the debility of the body to which it is attached.'

The perniciousness of alcoholism may be viewed, particularly in this more enlightened era, as being as disabling, indeed if not more so, as any other ailment to which the mind and body of people are vulnerable. And that the

care provided toward restoring the minds of bodies of those who had been afflicted, may differ from the care familiar to us as customarily being associated with the traditional nursing home, should make it no less a 'nursing home'. Indeed, the attention directed by Interim House to its residents, extending as it does not only to physical needs but also to manifest or latent psychological deficits, might well be one to be emulated by every nursing home, traditional or otherwise. (Footnotes omitted, existing footnotes added.)

ORDER

AND Now, this 9th day of June, 1978, the final decree in this matter dated November 4, 1976 is affirmed.